# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

---------------------------------------------------------

WILLIAM CARTER, Individually and on    :
Behalf of All Others Similarly Situated,    :
205 West End Avenue,    :    Civil Action No. _____
New York, NY 10023    :
   :
         Plaintiff,    :    **CLASS ACTION COMPLAINT FOR**
   :    **VIOLATIONS OF SECTIONS 14(a)**
v.    :    **AND 20(a) OF THE SECURITIES**
   :    **EXCHANGE ACT OF 1934**
COLONY CAPITAL, INC.    :
SERVE ON:    :    **JURY TRIAL DEMAND**
CSC-LAWYERS INCORPORATING    :
   SERVICE COMPANY    :
7 St. Paul Street    :
Suite 820    :
Baltimore, MD 21202    :
(Baltimore City)    :
   :
THOMAS J. BARRACK, JR.    :
c/o Colony Capital, Inc.    :
515 South Flower Street    :
44th Floor    :
Los Angeles, CA 90071    :
   :
RICHARD B. SALTZMAN    :
c/o Colony Capital, Inc.    :
515 South Flower Street    :
44th Floor    :
Los Angeles, CA 90071    :
   :
NANCY A. CURTIN    :
c/o Colony Capital, Inc.    :
515 South Flower Street    :
44th Floor    :
Los Angeles, CA 90071    :
   :
GEORGE G.C. PARKER    :
c/o Colony Capital, Inc.    :
515 South Flower Street    :
44th Floor    :
Los Angeles, CA 90071    :

JOHN A. SOMERS                                    :
c/o Colony Capital, Inc.                          :
515 South Flower Street                           :
44th Floor                                        :
Los Angeles, CA 90071                             :
                                                  :
and                                               :
                                                  :
JOHN L. STEFFENS                                  :
c/o Colony Capital, Inc.                          :
515 South Flower Street                           :
44th Floor                                        :
Los Angeles, CA 90071                             :
                                                  :
                    Defendants.                   :
---------------------------------------------------------   :


## CLASS ACTION COMPLAINT

William Carter ("Plaintiff"), on behalf of himself and all others similarly situated, by and

through his attorneys, alleges the following upon information and belief, including investigation

of counsel and review of publicly-available information, except as to those allegations pertaining

to Plaintiff, which are alleged upon personal knowledge:

1.      This is a class action brought by Plaintiff on behalf of himself and the other public

shareholders of Colony Capital, Inc. ("Colony" or the "Company"), other than Defendants and

their affiliates, against Colony and the members of its board of directors (the "Board" or the

"Individual Defendants," and together with Colony, the "Defendants") for their violations of

Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C.

§§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the Proposed

Transaction (the "Proposed Transaction") between Colony, NorthStar Asset Management Group

1

Inc. ("NSAM"), and NorthStar Realty Finance Corp. ("NRF" and together  NSAM, "NorthStar").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading joint proxy statement/prospectus (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC")[1].  The Proxy recommends that Colony shareholders vote in favor of the Proposed Transaction.  Pursuant to the terms of the definitive agreement and plan of merger Colony and NorthStar entered into (the "Merger Agreement"), Colony class A and class B common stockholders stand to receive 1.4663 shares of their respective class of stock in the post-merger combined company, Colony NorthStar, Inc. (the "Merger Consideration").  Colony stockholders are expected to own approximately 32.85% of the combined company.

3.      As discussed below, the Merger Consideration and the Proposed Transaction are fundamentally unfair to Plaintiff and the other common shareholders of Colony.  Simply put, the Board has agreed to a deal where Colony shareholders receive no premium for their shares and end up with a diluted ownership stake in a combined company that will be dragged down by the recent financial and corporate governance problems that have plagued the NorthStar entities.

4.      Defendants have now asked Colony's shareholders to support the Proposed Transaction in exchange for the inadequate Merger Consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for Colony,

---

[1] An initial joint proxy statement/prospectus was filed with the SEC on July 29, 2016. Defendants subsequently caused an amended joint proxy statement/prospectus to be filed with the SEC on September 15, 2016, which serves as the basis for the allegations contained herein.

NSAM and NRF, which were relied upon by the Board in assessing the fairness of the Merger Consideration and by the Company's financial advisor, Merrill, Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") in connection with preparing its fairness opinion; and (ii) certain information regarding the valuation analyses BofA Merrill Lynch performed in support of its fairness opinion.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Colony's shareholders.  In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Colony is incorporated in Maryland; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in

the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

9.     Venue is also proper in this District because on June 2, 2016 the Individual Defendants amended the bylaws of Colony to designate this court as the exclusive forum for certain actions against the Defendants.

## PARTIES

10.     Plaintiff is, and has been at all relevant times, the owner of Colony common stock and has held such shares since prior to the wrongs complained of herein.

11.     Defendant Colony is a Maryland corporation.  Colony is a real estate finance company that acquires, originates, and manages a diversified portfolio of real estate related debt instruments.

12.     Individual Defendant Thomas J. Barrack, Jr. ("Barrack") is, and has been at all relevant times, a Colony director.  Barrack has served as the executive chairman of the Board since June 2009.  Since January 2016, Mr. Barrack has served as co-chairman of the board of trustees of Colony Starwood Homes (NYSE: SFR), a leading single-family rental real estate investment trust. Since January 2014, Mr. Barrack has served on the board of directors of Carrefour S.A., a French multinational retailer and the second largest retailer in the world. Since June 2010, Mr. Barrack has served on the board of directors of First Republic Bank, a full service bank and wealth management firm. From January 2006 to April 2013, Mr. Barrack served on the public board of directors of Accor, S.A., a major global hotel group listed on Euronext Paris. Mr. Barrack has also served on the public board of Challenger Financial Services Group Limited, a diversified financial services organization listed on the Australian Securities

Exchange from November 2007 to October 2010. From August 1994 to September 2007, Mr. Barrack served on the board of Continental Airlines, Inc.

13.     Individual Defendant Richard B. Saltzman ("Saltzman") has served as Colony's Chief Executive Officer, President and as a director since its formation in June 2009.  Prior to joining the Colony Capital business in 2003, Mr. Saltzman spent 24 years in the investment banking business primarily specializing in real estate-related businesses and investments.  Most recently, he was a Managing Director and Vice Chairman of Merrill Lynch's investment banking division.  As a member of the investment banking operating committee, he oversaw the firm's global real estate, hospitality and restaurant businesses. Previously, he also served as Chief Operating Officer of Investment Banking, had responsibility for Merrill Lynch's Global Leveraged Finance business.  Mr. Saltzman serves on the Board of Directors of Kimco Realty Corporation (NYSE: KIM) and the Board of Trustees of Colony Starwood Homes (NYSE: SFR). Previously, he was also a member of the Board of Governors of the National Association of Real Estate Investment Trusts ("NAREIT"), on the board of directors of the Real Estate Roundtable and a member of the Board of Trustees of the Urban Land Institute, Treasurer of the Pension Real Estate Association, a Director of the Association of Foreign Investors in Real Estate and a past Chairman of the Real Estate Capital Policy Advisory Committee of the National Realty Committee.

14.     Individual Defendant Nancy A. Curtin ("Curtin") was appointed by the Board to serve as a Colony director in August 2014.  Mrs. Curtin is the Chief Investment Officer and Head of Investments of Close Brothers Asset Management ("CBAM").  CBAM is the asset management arm of Close Brothers Group Plc ("CBG").  Prior to CBAM, Mrs. Curtin has had a range of senior roles in asset management, private equity and alternative asset investing.  She

served as the Chief Investment Officer and Managing Partner of Fortune Asset Management Limited, an alternative asset management firm working with institutional, HNW and family office clients, from April 2002 until it was purchased by CBAM in January 2010.

15.     Individual Defendant George G.C. Parker ("Parker") has served as a Colony director since its initial public offering in September 2009, and currently serves as chairman of our audit committee.   Mr. Parker is a member of the board of directors of Threshold Pharmaceuticals, Inc., a publicly traded biotechnology company, and First Republic Bank, a California banking company.   From March 2001 to January 2015, Mr. Parker served on the board of directors of iShares Exchange Traded Funds, an investment company, including as independent chairman.  Mr. Parker served as a member of the board of directors of Tejon Ranch Company, a publicly traded real estate development company, from May 1998 to March 2015, including as Chairman of its Audit Committee.   From 1996 to 2009, Mr. Parker served on the public board of Continental Airlines, Inc.

16.     Individual Defendant John A. Somers ("Somers") has served as a Colony director since the Company's initial public offering in September 2009 and currently serves as chairman of the Compensation Committee.  Mr. Somers has been a private investor since June 2006.  From 1996 to June 2006, Mr. Somers was Head of Fixed Income and Real Estate for Teachers Insurance and Annuity Association and College Retirement Equities Fund (TIAA-CREF), and served there as an Executive Vice President from 1996 to 2004.  Prior to joining TIAA-CREF, from 1972 to 1981, Mr. Somers held several positions in the Real Estate Investment Department, including Vice President, for Prudential Insurance Company of America.

17.     Individual Defendant John L. Steffens ("Steffens") has served as a Colony director since the Company's initial public offering in September 2009 and currently serves as

chairman of the nominating and corporate governance committee.  Mr. Steffens is the founder of Spring Mountain Capital, L.P.; founded in 2001, Spring Mountain Capital, L.P. specializes in providing advisory services and alternative investments for institutional and private investors. Prior to establishing Spring Mountain Capital, Mr. Steffens spent 38 years at Merrill Lynch & Co., Inc., where he held numerous senior management positions.  Mr. Steffens served on the Board of Directors of Merrill Lynch & Co., Inc. from April 1986 until July 2001.  Mr. Steffens currently serves on the Advisory Board of StarVest Partners, the Advisory Board of Wicks Communication & Media Partners, L.P., the Board of Directors of HealthPoint Capital, a global medical device company, the Board of Trustees of Colony Starwood Homes (NYSE: SFR) since January 2016, and as Chairman of the Board of Directors of Cicero, Inc., a publicly traded provider of business integration software, since May 2007.

## SUBSTANTIVE ALLEGATIONS

### The Proposed Transaction Is Not In The Best Interests Of Colony Shareholders

18.     Colony is a real estate investment trust.  The firm invests in the real estate markets of North America and Europe.  Its investment portfolio is primarily composed of real estate equity, real estate and real estate-related debt, and investment management of company-sponsored private equity funds and vehicles.  Colony invests in wide spectrum of commercial real estate property types, including office, industrial, retail, hospitality, education, single-family and multifamily residential assets, and geographies, primarily within North America and Europe. The Company was formed in June 2009 and was formerly known as Colony Financial, Inc.

19.     The Merger Consideration fails to adequately compensate Colony's shareholders in light of the Company's recent and historical financial performance and strong growth prospects.

20.     The Company's strong growth prospects are reflected by its recent financial results.  Specifically, on August 8, 2016 Colony announced a record level of core funds from operations ("Core FFO") of $100.4 million, up from $58.6 million during the same quarter of 2015.

21.     On May 9, 2016, Colony announced the following impressive financial results for the first quarter of 2016: Core FFO was $55.9 million, up from $53.5 million during the same period the previous year; and FFO was $36.7 million, up from $29.6 million during the same period the previous year.

22.     On February 26, 2016, Colony announced strong fourth quarter and full year 2015 financial results.  Specifically, the Company announced: Core FFO of $76.7 million for the quarter, up from $48.4 million; FFO of $54.2 million, up from $28.8 million; for the full year 2015, the Company reported total income of $842.0 million and net income attributable to common stockholders of $107.4 million, or $0.96 per basic share. Core FFO was $260.4 million, or $2.03 per basic share, and FFO was $239.3 million, or $1.87 per basic share.

23.     Commenting on Colony's strong fiscal year results, Individual Defendant Richard Saltzman, the Company's President and CEO, stated:

> **We had a strong finish to another outstanding year of performance**…As a transformed internally managed global real estate and investment company renamed Colony Capital Inc., we are very pleased with our new baseline annual results. Our financial picture is sound including modest leverage at approximately 1:1 overall, limited near term debt maturities, and solid earnings coverage of our dividend. Furthermore, the global environment remains ever more conducive to the types of investments we find the most attractive from a risk/reward standpoint.

24.     Despite Colony's strong stand-alone prospects, the Board has agreed to a three-way merger of purported "equals" with NSAM and NRF, but neither company's prospects are as

strong as Colony's.  if the Proposed Transaction is consummated, Colony's current shareholders will own only approximately 33.25% of a combined entity dragged down by the problems that have plagued NorthStar in recent quarters.  As an article on investor website *Seeking Alpha* stated, "Colony Capital holders are probably frustrated to be dragged down by the falling NorthStars."  Indeed, because the Proposed Transaction is being touted as a merger of equals, Colony shareholders are not receiving a premium for their shares.  But the NorthStar entities are not on equal footing with Colony, and Colony shareholders should have received a greater exchange ratio and ownership percentage of the combined company.

25.     Furthermore, if the Proposed Transaction is consummated, NorthStar's executives will receive significant amounts in executive compensation, money which otherwise would have remained in the coffers of the combined company.  Most troublingly, NorthStar executives David Hamamoto, Al Tylis, and Dan Gilbert will share $106 million in "change of control" compensation even though Hamamoto and Gilbert will continue as senior executives of the merged company.

26.     In sum, Colony is well-positioned to generate significant earnings in the foreseeable future.  Despite Colony's bright financial prospects, the Board has now agreed to combine the Company with two weaker entities and without obtaining any premium for the Company's shareholders.  It is therefore imperative that Colony shareholders receive all material information concerning the Proposed Transaction, so that they may properly evaluate whether or not it is in their best interests.

**The Proposed Board Structure of Colony NorthStar Threatens to Devalue Colony Shareholders' Equity Interest in the Post-Close Company**

27.     In addition to failing to obtain adequate consideration for the Company's shareholders, the Individual Defendants have also agreed to corporate governance measures for

Colony NorthStar that will impede its ability to function efficiently and maximize value for its stockholders.

28.     Specifically, the Merger Agreement provides that the Colony NorthStar board will consist of thirteen members, six of whom will be designated by Colony, six of whom will be designated by NorthStar, and one of whom will be jointly designated by Colony and NorthStar.

29.     Colony shareholders will not benefit from a post-close entity that is governed by thirteen directors, which is an unmanageable and expensive number of individuals to have on a board of directors.  Thus, the size of the Colony NorthStar board should be reduced, and should include at least one designee chosen by shareholders.  The Colony NorthStar board should also be de-staggered, which will allow shareholders to effectuate significant changes more quickly in the event they are dissatisfied with the performance of the post-close entity.

**The Preclusive Deal Protection Provisions**

30.     Furthermore, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Colony.

31.     First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Colony shareholders.

32.     Additionally, the Merger Agreement grants NorthStar recurring and unlimited matching rights, which provides the NorthStar entities with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three business days to negotiate with Colony, amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received.

33.     The non-solicitation and matching rights provisions essentially ensure that a superior deal will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that NorthStar can easily foreclose a competing bid.  As a result, these provisions unreasonably favor NorthStar, to the detriment of Colony's public shareholders.

34.     Lastly, the Merger Agreement provides for termination fee of $92 million in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Colony shareholders with a superior offer.

35.     Ultimately, these preclusive deal protection provisions restrain Colony's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

36.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior deal from emerging, it is imperative that Colony's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

37.     On September 15, 2016, Defendants caused the Proxy to be filed with the SEC, and the Proxy has been published on the SEC's online Edgar database.  The information contained in the Proxy has thus been disseminated to Colony shareholders to solicit their vote in favor of the Proposed Transaction.  The Proxy omits certain material information concerning the fairness of the Proposed Transaction and Merger Consideration. Without such information, Colony shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

38.     First, the "Certain Unaudited Prospective Financial Information of Colony" section on page 185 of the Proxy provides line item projections for certain non-GAAP (generally accepted accounting principles) measures without providing sufficient information concerning the various adjustments that were made to each measure, which renders the disclosed projections materially misleading.   Indeed, the Proxy at page 185 notes that "[t]he Colony Standalone Projections include certain non-GAAP financial measures.  **Non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP**, and non-GAAP financial measures as presented in this joint proxy statement/prospectus may not be comparable to similarly titled amounts used by Colony or other companies."   Yet by providing Colony shareholders with the non-GAAP projections, which have been further adjusted in unique ways by the Company, the Individual Defendants are in fact asking Colony shareholders to consider the projections in isolation from and as a substitute for financial information presented in compliance with GAAP.

39.     Specifically, the Proxy contains Colony's projections for Net Revenues, EBITDA, and Core FFO.  The Proxy fails to disclose that EBITDA is a non-GAAP measure, but does note that "Colony defines EBITDA as Core FFO (another non-GAAP measure) plus preferred dividends, plus Colony's share of cash interest expense and taxes."  Proxy at 186.  The Proxy goes on to note that Colony defines Core FFO "as funds from operations, which we refer to as FFO, adjusted for the following metrics, including Colony OP's share of these metrics recognized by Colony OP's unconsolidated partnerships and joint ventures: (i) gains and losses from sales of depreciable real estate, net of depreciation, amortization and impairment previously adjusted for FFO; (ii) stock compensation expense; (iii) effects of straight-line rent revenue and straight-line rent expense on ground leases; (iv) amortization of acquired above- and below-

market lease values; (v) amortization of deferred financing costs and debt premiums and discounts; (vi) unrealized fair value gains or losses on derivative instruments and on foreign currency remeasurements; (vii) acquisition-related expenses, merger and integration costs; (viii) amortization and impairment of finite-lived intangibles related to investment management contracts and customer relationships; (ix) deferred tax benefit related to amortization and impairment of investment management contracts and customer relationships; (x) gain on remeasurement of consolidated investment entities, net of deferred tax liability, and the effect of amortization thereof; (xi) non-real estate depreciation and amortization; and (xii) change in fair value of contingent consideration."  The Proxy then goes on to explain how it calculates FFO, but fail to provide the projections for FFO or any of the metrics that go into calculating FFO.

40.     The Proxy thus fails to provide the line item projections for the various adjustments made to Colony's non-GAAP financial projections included in the Proxy, and further fails to reconcile the adjustments by providing the most directly comparable financial measures calculated and presented in accordance with GAAP.  The omission of such information renders the Colony non-GAAP financial projections disclosed in the Proxy misleading.

41.     Furthermore, the sections of the Proxy summarizing NSAM's and NRF's financial projections are similarly misleading because they also fail to disclose the line item projections for the adjustments that were made to the various non-GAAP financial projections that are disclosed.  NSAM's and NRF's projections are material to Colony's shareholders, as the Proposed Transaction is being touted as a merger of equals and Colony shareholders are being offered equity in a combined entity (Colony NorthStar) that will be directly and significantly impacted by the future business prospects of both NSAM and NRF.  It is therefore imperative

that Colony shareholders are able to properly assess NSAM's and NRF's projections in order for them to assess the fairness of the Merger Consideration and the Proposed Transaction.

42.     With respect to the "Certain Unaudited Prospective Financial Information of NSAM" section of the Proxy at page 169, the Proxy includes NSAM's projections for Net Revenues, EBITDA, and CAD.  The Proxy then describes the various adjustments that were made to these non-GAAP measures, but fails to disclose the line item projections for the adjustments.

43.     With respect to NSAM's projections for Net Revenues, the Proxy states that "Net Revenues are defined as the sum of: (i) asset management and all other fees; (ii) selling commission and dealer manager fees; and (iii) other income; less (iv) commission expense. Asset management and other fees include fees earned from NRF and NRE, acquisition, disposition and other fees earned from NSAM's retail companies and fees earned from clients and limited partners of The Townsend Group. Asset management and other fees are recognized based on contractual terms specified in the underlying governing documents in the periods during which the related services are performed and the amounts have been contractually earned. Incentive fees and payments are recognized subject to the achievement of return hurdles in accordance with the respective terms set forth in the governing documents. Selling commission and dealer manager fees represent income earned by NSAM for selling equity in NSAM's sponsored companies through NorthStar Securities, LLC. Other income primarily represents dividend income received from NSAM's investments in securities including NRF and NRE common stock, NSAM's share of investment income in unconsolidated joint ventures American Healthcare Investors LLC and Island Hospitality Management Inc., excluding non-cash deductions added back for purposes of calculating CAD, and special servicing fees related to

certain securitization transactions at the corporate level." None of the projections for the metrics used to calculate Net Revenues are disclosed.

44.     With respect to NSAM's projections for the non-GAAP metric EBITDA, the Proxy notes that "EBITDA is defined as net revenues less cash general and administrative expenses. Cash general and administrative expenses include salaries and related expenses and other general and administrative expenses and exclude equity-based compensation expense." The projections for the metrics used to calculate the non-GAAP metric EBITDA are not disclosed.

45.     With respect to NSAM's projections for the non-GAAP metric "CAD", the Proxy notes that "CAD is calculated by subtracting from or adding to net income (loss) attributable to common stockholders, non-controlling interests attributable to the operating partnership and the following items: equity-based compensation, depreciation and amortization related items, amortization of deferred financing costs, foreign currency gains (losses), impairment on goodwill and other intangible assets, straight-line rent, adjustments for joint ventures and investment funds, deferred tax (benefit) expense related to timing differences that are not expected to reverse in the current year, unrealized (gain) loss from fair value adjustments, realized gain (loss) on investments and other, timing differences associated with receiving incentive fees and the related compensation expense and transaction and other costs. In future periods, such adjustments may include other one-time events pursuant to changes in GAAP and certain other non-recurring items. These items, if applicable, include any adjustments for unconsolidated ventures. The management of NSAM also believes that quarterly distributions are principally based on operating performance and the NSAM board includes CAD as one of several metrics it reviews to determine quarterly distributions to stockholders. **CAD should not be considered as an**

**alternative to net income (loss) attributable to common stockholders, determined in accordance with GAAP, as an indicator of operating performance. In addition, our methodology for calculating CAD involves subjective judgment and discretion, and may differ from the methodologies used by other comparable companies, when calculating the same or similar supplemental financial measures and may not be comparable with these companies**." None of the projections for the metrics used to calculate the non-GAAP measure "CAD" are disclosed.

46.     With respect to the "Certain Unaudited Prospective Financial Information of NRF" section of the Proxy at page 199, the Proxy includes NRF's non-GAAP projections for NOI & Other Revenue, EBITDA before Equity-Comp, and CAD. The Proxy then describes the various adjustments that were made to these non-GAAP measures, but fails to disclose the line item projections for the adjustments.

47.     With respect to NRF's projections for NOI, the Proxy states that "NRF defines Net Operating Income, or NOI, as total property and related revenues, adjusted for: (i) amortization of above/below market rent; (ii) straight line rent; (iii) other metrics such as adjustments related to joint ventures, cash flow related to community fees and non-recurring bad debt expense; and (iv) less property operating expenses. **However, the usefulness of NOI is limited because it excludes general and administrative costs, interest expense, transaction costs, depreciation and amortization expense, realized gains (losses) from the sale of properties and other metrics under GAAP and capital expenditures and leasing costs necessary to maintain the operating performance of properties, all of which may be significant economic costs. NOI may fail to capture significant trends in these components of GAAP net income (loss) which further limits its usefulness**." In other words, the Proxy

tells shareholders trying to assess the fairness of the Proposed Transaction and make sense of NRF's financial projections that the disclosed projections are actually useless to them, and further fails to provide them with the projections that would allow them to make sense of the useless and misleading projections that are included in the Proxy.

48.     With respect to NRF's projections for "Other Revenue" the Proxy notes that "NRF defines Other Revenue as net interest income derived from: (i) real estate debt investments; (ii) real estate securities; and (iii) equity in earnings from investments in unconsolidated ventures. NRF recognizes interest income from real estate securities using the effective interest method with any premium or discount amortized or accreted through earnings based on expected cash flow through the expected maturity date of the security. Unconsolidated ownership interest in an entity may be accounted for using the equity method, at fair value or the cost method.  NRF elected the fair value option for its investments (directly or indirectly in joint ventures) that own limited partnership interests in real estate private equity funds and certain investments in unconsolidated ventures."   None of the projections for the metrics used to calculate the non-GAAP metric "Other Revenue" are disclosed.

49.     With respect to NRF's projections for "EBITDA before Equity-Comp", another non-GAAP financial measure which was then further uniquely adjusted by NRF, the Proxy states that "NRF defines EBITDA before Equity-Comp as NOI and Other Revenue less general and administrative expenses, straight line rent and above/below market lease adjustments. Cash general and administrative expenses include the annual management fee, salaries and related expenses and other general and administrative expenses and exclude equity-based compensation expense."   None of the projections for the metrics used to calculate the non-GAAP metric "EBITDA before Equity-Comp" are disclosed.

50.     With respect to NRF's projections for CAD, the Proxy notes that "CAD should not be considered as an alternative to net income (loss) attributable to common stockholders, determined in accordance with GAAP, as an indicator of operating performance." Net income projections are not disclosed in the Proxy, however. The Proxy goes on to state that " NRF defines CAD by subtracting from or adding to net income (loss) attributable to common stockholders, non-controlling interests and the following metrics: depreciation and amortization metrics including depreciation and amortization, straight-line rental income or expense (excluding amortization of rent free periods), amortization of above/below market leases, amortization of deferred financing costs, amortization of discount on financings and other and equity-based compensation; cash flow related to N-Star CDO equity interests; accretion of consolidated N-Star CDO bond discounts; non-cash net interest income in consolidated N-Star CDOs; unrealized gain (loss) from the change in fair value; realized gain (loss) on investments and other, excluding accelerated amortization related to sales of CDO bonds or other investments; provision for loan losses, net; impairment on depreciable property; non-recurring bad debt expense; deferred tax benefit (expense); acquisition gains or losses; distributions and adjustments related to joint venture partners; transaction costs; foreign currency gains (losses); impairment on goodwill and other intangible assets; gains (losses) on sales; and one-time events pursuant to changes in GAAP and certain other non-recurring metrics." None of the projections for the metrics used to calculate the non-GAAP metric "CAD" are disclosed.

51.     In sum, the Proxy provides shareholders with a hodge-podge of various non-GAAP financial projections, each of which are inherently misleading and none of which shareholders can actually use or rely on to make sense of the information that is disclosed in the Proxy or to assess the fairness of the Proposed Transaction. By way of example, with respect to

NSAM's and NRF's projections for CAD, the Proxy notes that their "**methodology for calculating CAD involves subjective judgment and discretion and may differ from the methodologies used by other comparable companies, including other REITs, when calculating the same or similar supplemental financial measures and may not be comparable with these companies**."  CAD projections are not included in the Proxy for Colony.

52.     In other words, each company involved in the Proposed Transaction has their own unique ways of preparing their various non-GAAP projections, and shareholders are left scratching their heads trying to make sense of it all.  Indeed, the inconsistencies between the projections disclosed in the Proxy for each company impede shareholders from assessing the relative valuations of each company and the fairness of the exchange ratios; shareholders simply cannot accurately compare Colony's projections for Net Revenue, EBITDA, or Core FFO with NRF's projections for NOI & Other Revenue, EBITDA before Equity-Comp, and CAD or with NSAM's projections for Net Revenue, EBITDA or CAD, because doing so based on the currently disclosed projections would be comparing apples to oranges.  The line item projections for the various adjustments that were made to each of Colony's, NRF's and NSAM's financial projections must be disclosed to shareholders in order to make the currently disclosed projections not misleading.

53.     The SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses material information in a Proxy that includes non-GAAP financial measures, the Company must also disclose that non-GAAP financial measure along with comparable GAAP measures and a quantitative reconciliation of forward-looking information.  17 C.F.R. § 244.100.

54.     Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.   The SEC Chair, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Colony and NorthStar have included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.   And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

55.     In recent months, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heighted its scrutiny of the use of such projections.[3]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance

---

[2] *See* Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability (June 27, 2016), www.sec.gov/news/speech/chair-white-icgn-speech.html#_ftnref38 (emphasis added) (footnotes omitted).

[3] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses*

released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy. One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts. The above-referenced line item projections that have been omitted from the Proxy are precisely the types of "reconciling metrics" that the SEC has recently indicated should be disclosed to render non-GAAP financial projections not misleading to shareholders.

56.    Lastly, with respect to BofA Merrill Lynch's Discounted Cash Flow ("DCF") Analysis (Proxy at 179), the Proxy fails to disclose the "unlevered, after-tax free cash flows that Colony, NRF and NSAM were forecasted to generate" through 2018. Cash flow projections are amongst the most important valuation metrics when attempting to value a company. The omission of the cash flow projections from the Proxy render the summary of BofA Merrill Lynch's DCF Analysis and the summary of each company's financial projections materially incomplete and therefore misleading.

57.    Based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Colony shareholders will suffer if they are required to vote on the Proposed Transaction without the above-referenced material misstatements and omissions being remedied.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Colony common stock who are being and will be harmed by Defendants' actions described below (the "Class").

*Into   Profits*,   N.Y.   Times,   Apr.   22,   2016,   http://www.nytimes.com/ 2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

59.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of August 5, 2016 there were over 113 million outstanding shares of Colony common stock.  The holders of these shares are believed to be geographically dispersed throughout the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members.  The common questions include, *inter alia*, the following:

    i.   Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

    ii.  Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

    iii. Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Proposed Transaction based upon a Definitive Proxy that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

(g)     A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

### CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

60.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

61.     Defendants have filed the Proxy with the SEC with the intention of soliciting Colony shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

62.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Colony, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

63.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

64.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) the financial projections for Colony, NSAM and NRF, which were relied upon by the Board in assessing the fairness of the Merger Consideration and by BofA Merrill Lynch in connection with preparing its fairness opinion; and (ii) certain information regarding the valuation analyses BofA Merrill Lynch performed in support of its fairness opinion.

65.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Proxy makes clear that the Individual Defendants reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  The Individual Defendants were therefore negligent in preparing and reviewing the Proxy.

66.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     The Individual Defendants acted as controlling persons of Colony within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Colony and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

69.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

71.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

72.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

73.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

74.     Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with the

Colony shareholder vote on the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 29, 2016

**BROWER PIVEN**
A Professional Corporation

*/s/ Yelena Trepetin*
Charles J. Piven (Md. Fed. Bar No. 00967)
Email: piven@browerpiven.com
Yelena Trepetin (Md. Fed. Bar No. 28706)
Email: trepetin@browerpiven.com
1925 Old Valley Road
Stevenson, MD 21153
Tel: (410) 332-0030
Fax: (410) 685-1300

Juan E. Monteverde
**MONTEVERDE & ASSOCIATES PC**
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Tel: (212) 971-1341
Cell: (305) 205-8284 or (646) 522-4840
Email: jmonteverde@monteverdelaw.com

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*