IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MARYLAND

WILLIAM CARTER, *Individually and* )
*on Behalf of All Others Similarly* )
*Situated,* )
       Plaintiff, )
   vs. )
                ) CIVIL NO.: JKB-16-3282
COLONY CAPITAL, Inc., )
                )
       Defendant. )
                )
_____)
CINDY KESSLER, *Individually and* )
*on Behalf of All Others Similarly* )
*Situated,* )
       Plaintiff, )
   vs. )
                ) CIVIL NO.: JKB-16-3745
NORTHSTAR ASSET MANAGEMENT GROUP, )
                )
       Defendant. )
                )
_____)
JACK BOOTHE, *Individually and* )
*on Behalf of All Others Similarly* )
*Situated,* )
       Plaintiff, )
   vs. )
                ) CIVIL NO.: JKB-16-3742
NORTHSTAR REALTY FINANCE CORP., )
                )
       Defendant. )
                )
_____)


Transcript of Proceedings
Before the Honorable James K. Bredar
Friday, October 27th, 2017
Baltimore, Maryland

_____

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

<u>APPEARANCES</u>

For Plaintiff William Carter:

     Juan E. Monteverde, Esquire

     Yelena Trepetin, Esquire

For the Defendant Colony Capital, Inc.:

     Tariq Mundiya, Esquire

     Scott R. Haiber, Esquire

For Plaintiff Cindy Kessler:

     Guri Ademi, Esquire

     Yelena Trepetin, Esquire

For the Defendant Northstar Asset Management Group:

     William M. Krulak, Jr., Esquire

For Plaintiff Jack Boothe:

     James M. Wilson, Jr., Esquire

     Yelena Trepetin, Esquire

For the Defendant Northstar Realty Finance Corp.:

     Andrew Gendron, Esquire


Also present:  Lawrence Dvores
              Philip Robinson
              Howard Hoffman

---

Christine T. Asif, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201

P R O C E E D I N G S

THE COURT:  Good morning.  Be seated please.

Mr. Goldsmith, you may call the case.

THE CLERK:  The matters now pending before this court is Kessler versus Northstar Asset Management Group Incorporated, et al., civil number JKB-16-3745; Carter versus Colony Capital Incorporated, et al., case number JKB 16-3282; Boothe versus Northstar Reality Finance Corp., et al, civil number JKB-16-3742.  These matters come before this court for a fairness hearing.

THE COURT:  Appearances.  Plaintiffs.

MS. TREPETIN:  Good morning, Your Honor, Yelena Trepetin with Brower Piven, local counsel for all the plaintiffs.

MR. MONTEVERDE:  Good morning, Your Honor, Juan Monteverde with Monteverde and Associates, counsel in the Colony Capital matter.

MR. WILSON:  Your Honor, James Wilson from Faruqi and Faruqi for plaintiffs in the Boothe v. NRF, 16-CV-3742.

MR. ADEMI:  Guri Ademi for the plaintiffs, from Ademi & O'Reilly, for plaintiff Cindy Kessler.

MR. MUNDIYA:  Good morning, Your Honor.  Tariq Mundiya from the Willkie Farr firm in New York for the Colony defendants in 16-CV-3282.

MR. HAIBER:  Your Honor, Scott Haiber from Hogan

1    Lovells, I'm local counsel in the same case, the Colony

2    case.

3            MR. GENDRON:  Good morning, Your Honor, Andrew

4    Gendron from Venable on behalf of the defendants in 16-3742,

5    the Boothe case.

6            MR. KRULOK:  Good morning, Your Honor, Bill Krulok

7    from Miles & Stockbridge, on behalf of the NSAM defendants in

8    3745.

9            THE COURT:  Thank you, gentleman.  You may be

10   seated.

11           Good morning, sir, you are Lawrence Dvores?

12           MR. DVORES:  Yes, I am.

13           THE COURT:  Did I pronounce your name correctly?

14           MR. DVORES:  That's correct.

15           THE COURT:  Okay.  And Mr. Dvores you are an

16   interested party here today, and are here in the status of an

17   objector; is that correct?

18           MR. DVORES:  Correct.

19           THE COURT:  Good morning to you.

20           Mr. Robinson?

21           MR. ROBINSON:  Good morning, Your Honor.  I'm

22   representing Mr. Hoffman as an objector today.

23           THE COURT:  And good morning to you Mr. Robinson

24   and --

25           MR. ROBINSON:  Mr. Hoffman is sitting to my left.

1          THE COURT:  Right.  That's fine.  You can stay

2     there.  Ordinarily, counsel sits further in and the client

3     sits further out, but that's no problem.  I've got it.

4          Okay.  So we'll hear first on behalf of the

5     plaintiffs why they think it is that the Court should go ahead

6     and ratify this agreement.  I will tell you at the outset, I

7     have some concerns.  Some are less specific and less strongly

8     held and some are quite strongly held.  In the former

9     category, I'm most interested in hearing about how the

10    coordination of plaintiffs counsel in the circumstances of

11    this case, with these entities seeming to have distinctly

12    different interests, at least at the beginning of the merger

13    process, how that coordination doesn't give rise to a conflict

14    on the plaintiff's side.  But far and away my greatest concern

15    with respect to what's been submitted to the Court is the

16    total amount of the attorney's fees, which I'm unlikely to

17    approve.  But I will hear from the plaintiffs on that.

18         But make whatever presentation you wish.  I'll hear

19    from you first.  We'll see if the defendants wish to speak

20    before we go to the objectors.

21         MR. MONTEVERDE:  Thank you, Your Honor.  Juan

22    Monteverde with Monteverde and Associates.  And I'll start by

23    saying, because we are coordinated, I will be speaking on

24    behalf of all plaintiffs.  I have also prepared a Power Point.

25    I think Your Honor was given a booklet of it, that I will use

today to assist in this hearing.

Just for formality purpose, Your Honor, we're before you pursuant to Your Honor's July 10th, 2017, preliminary order --

THE COURT:  Well, that suggests that you're not as prepared as I thought you would be, it wasn't my order, it was Judge Motz' order.

MR. MONTEVERDE:  I apologize it was Judge Motz. You're actually correct.  Sorry, Your Honor.  And that's on slide 2, Your Honor.  So we had 141,000 notices that went out. And we provide the breakdown of how they went on each action. And we only have two objections for NSAM and NRF, we'll be referring as such Northstar, as a management of Northstar Reality Finance.

I think I'll just go right on Your Honor's concern, because I think it's going to be more efficient than what I had anticipated presented Your Honor, if I may.

My firm Monteverde and Associates, me personally, I'm a former partner of Faruqi & Faruqi.  I've been working with them for several years.  I also have been working with Ademi & O'Reilly for several years.  It's not unusual, Your Honor, to coordinate litigation.  We've done that in a number of cases.  And there was no conflict at any given time, Your Honor.  Because this was a disclosure case.  This was not a monetary case.  We were concerned with the proxy statement.

And the proxy statement affected all three members of the
class.  And all three had to present or cast an informed vote.
So I think that's really where we started the case and why
there's no conflict whatsoever.

I think I understand the objectors to raise the
issue that there are different prices and there's different
claims on the price.  Accept if I take a step back, this would
be under a state claim, a breach of fiduciary duty.  You would
have a claim for price, if this were a cash deal.  But this
was a stock transaction for all three members of the
transactions, for Colony Capital shareholders, NSAM
shareholders, and NRF, they were exchanging shares.  So
there's no *Revlon* duty under Delaware law for stock deals --

THE COURT:  There's no what?

MR. MONTEVERDE:  *Revlon*, R-e-v-l-o-n, It's what's
referred to as *Revlon* -- that's the duty to maximize
shareholder value.

THE COURT:  Yes.

MR. MONTEVERDE:  And, similarly, under Maryland law,
under *Laureate*, you don't have a duty either to maximize
shareholder value when it's not a cash transaction.  We were
not suing on that any way, but let's keep that in mind.  There
was no claim where we could sue for price under fiduciary duty
claims.  I think that's a very important distinction, which
gives rise to why there's no conflict and why coordination

made sense in this case. And each member of the class was
entitled to cast an informed vote and needed to receive what
we felt were essentially the efficient disclosures related to
the projections. And that's what this case involved.

And we were before Judge Motz on a preliminary
injunction or were heading towards a preliminary injunction
that was set for December 1st, if I recall correctly, and we
settled on the eve of that. And the injunction, Your Honor,
was just for that, please disclose all material information
related to the projections.

I'm not sure if I'm persuading Your Honor, but I
think it's an important distinction, that this case could not
arise a conflict because the claims didn't give for a
conflict. And it was investigation of the case after we
settled, Your Honor, after we settled each group conducted
depositions and they took the lead for their respective class.
So I took the depositions in the Colony Capital. And Mr.
Wilson's firm, Faruqi, took the depositions for the NRF
shareholders. And Mr. Ademi's firm took the depositions for
the NSAM group.

And I can assure you if any evidence would have been
uncovered, either group would have then not proceeded with the
settlement. And this is not just lip service. I can tell you
from personal experience, I've done that several times in the
last couple years. I did that in Mavenir in Delaware Chancery

Court, after entering into a disclosure and therapeutic MOU. I uncovered some issues that gave rise to being able to recover money for shareholders. We blew our own settlement, or we walked away from our own settlement, to pursue damages.

I did that in Syntroleum with my old firm Faruqi & Faruqi, and with Ademi & O'Reilly in Oklahoma. We obtained disclosures, gave us the opportunity to then conduct discovery. And we uncovered information that we were able to use to pursue a case for damages. But those two cases, for example, had what I called earlier *Revlon* duties, duty to maximize shareholder value. That's not here, Your Honor.

And in one case that comes to mind, it's on one of my slides, slide seven. Corwin v. KKR, Your Honor, I mean, essentially shareholder rights are -- every day are getting extinguished by some of the recent case law being developed in Delaware Chancery Court. And essentially it says you can ratify an arm's length transaction if you disclose all the material information. So that defendants cannot get sued for damages after the transaction closes. That's the law on a state fiduciary duty case.

And Colony Capital, it's a Maryland corporation, but NSAM and NRF are Delaware corporations. And it would certainly apply to NSAM and NRF. And on Colony Capital, Maryland has pretty much adopted Delaware law. So I think it should also apply. And that is if the information disclosed,

1    and there's an informed vote, you cannot sue for damages.  The

2    only exception is if there's entire fairness.  That's if it's

3    a controlled transaction, which wasn't the case here.  That's

4    normally when the CO takes a company private.

5            THE COURT:  How does this intersect with the

6    agreement then for the bar going forward to future litigation?

7    Are you saying that it really just flows naturally from law

8    that would be governing regardless of your agreement.

9            MR. MONTEVERDE:  Yes.  And that's why we can easily

10   give up claims because, frankly, there were no viable claims.

11   And we conducted deposition to ensure there was nothing that

12   could even arise to a potential argument for entire fairness,

13   which can be the traditional procedure where you have a lead

14   buyout, or it could be that someone is receiving a unique

15   benefit, sometimes there's an exception that allows sometimes

16   to argue entire fairness.  And no conflict existed here.

17           This was a process where there were different

18   bankers for each company.  We conducted depositions of each of

19   the investment bankers and of each of the directors for each

20   board.  And it was clear there was an informed board and there

21   were no issues of conflict of transactions, for example, that

22   were not disclosed or agreements -- consulting agreements that

23   had not been disclosed, things of that nature.

24           I will even point out one of our earlier claims was

25   that the Colony Northstar board was going to be excessive.  I

think originally they had 13 board members, that perhaps was one of the angles we could have pushed for. But they mooted that, because they changed the board constitution. I forget the timetable, but it was a few months after the transaction was announced. They reduced the board to 10. So that argument that it was excessive and onerous went out the window and it got mooted.

There were no claims whatsoever that we felt could be pursued. On the federal side, the Exchange Act, the statute is -- its purpose is to ensure an informed vote. That's its purpose. And if you have the disclosure of material information done before the vote, which is what the statute tends to ensure, there's no damages that you can pursue after.

And the disclosures we obtained, Your Honor, were significant here. And I'll walk briefly through it, Your Honor. It's on page 11, 12, and 13 of my Power Point. What we had before we were involved essentially were revenues. Problem with revenues is it's just earnings, it's not profitability. You don't really know what profits are. And that's what we got. We got net income for each of the three companies. That is very important information. If the objectors don't appreciate it, that's not really the issue. Who does appreciate it is the market. Shareholders and the market appreciate that. That's how you value companies.

And frankly, honest markets can only be honest if there is adequate disclosure of material financial information. And that was really -- that was the purpose of the case, Your Honor. And the injunction we filed was from that issue. And they agreed to give us the information. And then they agreed -- and the reason you enter into a settlement is you can do two things: They could give information, claim victory and seek a mootness fee, if the lawyers are just thinking about making money, which is the angle objectors are advancing here today; or you can do the right thing and used that as leverage to say we'll settle the litigation but we want discovery, which you couldn't have.

On an Exchange Act claim you would have a mandatory stay, or a PSLRA until you defeat a motion to dismiss. And under the state claims, post close you're very unlikely to be able to survive. There would be no set of facts. Unless you had some information that could show egregious fact pattern with a potential conflict, we may be able to argue a unique benefit for entire fairness. You can only get timely documents. So that's a good position to be in as a plaintiff lawyer, because we're doing the right thing to make sure there's an informed vote. And we get access to discovery that otherwise no one would ever get. And that's what we did to ensure that we were not giving up claims that have value.

And objectors are not here today saying, Your Honor,

1  we have a claim that we want to advance.  They're not saying

2  that.  At best they speculate that there could be claims, but

3  no one is really identifying them.  At heart they're upset

4  with the attorney fee.  And I hear Your Honor also thinks

5  that's an unreasonable attorney fee.  I submit to this Court,

6  the attorney fee is well in line with other cases.

7          THE COURT:  Other cases where what was achieved?

8          MR. MONTEVERDE:  What's that?

9          THE COURT:  Other cases where what was achieved?

10         MR. MONTEVERDE:  Same result, disclosure of

11 projections.  For example, *Affymetrix,* which I know we cited

12 in our brief and in our Power Point.  *Douglas versus Witney,*

13 that was in the Northern District of California last December,

14 before Judge Orrick.  I obtained an attorney fee of a million

15 dollars there for obtaining projections and the disclosure of

16 a conflict by the buyer investment banker.  Very similar type

17 of case.

18         The going rate for the disclosure only settlement

19 for average disclosures, Your Honor, is $500,000.  Projection

20 cases tend to yield higher attorney's fees.  DPL in Ohio

21 Federal Court yielded $700,000.  Tellabs in Illinois federal

22 court yielded $750,000.  Brightpoint in Indiana yielded

23 $600,000.  These are all federal cases.  And here we obtained

24 three sets of projections.  You could argue that our fee

25 should be $2.1 million, or $1.8 million in the aggregate.  And

we're not asking for that.  It's a reduced fee, frankly, Your

Honor.  It may sound high, but it's not.  And our lodestar

also supports that, Your Honor.  I'm not sure what I can --

THE COURT:  What relationship should your fee

petition bear to our own local rule schedule of appropriate

fees in --

MR. MONTEVERDE:  We cited the --

THE COURT:  -- in attorney's fees cases?

MR. MONTEVERDE:  We cited -- I know it's in the

briefing, we're in line with -- the name is escaping me,

Lafferty matrix (sic), I think it -- the name is escaping

me.

THE COURT:  Yes.

MR. MONTEVERDE:  Thank you.  We're in line with

those hourly rates, Your Honor.  So I'm not sure that is

different.

THE COURT:  At $950 an hour.

MR. MONTEVERDE:  That's the highest rate.  The

blended rate is $600, Your Honor.  I think Mr. Faruqi's hourly

rate is $950.  He's an individual who has been practicing for

over two or three decades and --

THE COURT:  I saw paralegal rates in the 300s,

unless I was misreading it.

MR. MONTEVERDE:  Well, I know it's not mine, because

I don't have paralegals that I'm billing for.  But it could be

that it's Faruqi Faruqi, but I know that they have very
skilled paralegals.  I think they're all in line with New York
market rates.  And I think Your Honor can rely on national
rates on these type of cases and you don't only need to focus
on locality.  That's -- normally judges do look at the
national rates.  I can assure you our hourly rates are less
than the adversaries that we're fighting against.  And courts
have also used that as an indication of fairness of hourly
rate of your opponent.  I know defense firms of the caliber as
these defense firms are in New York, do bill north of $1,000
an hour, some of the partners.  That's not unheard of, Your
Honor.

          I don't think -- and the lodestar is just one
aspect.  I think precedent of other cases is more analogous to
show what the benefit and the value of it is.  We don't get
paid more money, for example, in a projections case if we work
3,000 hours.  Because courts have said projection cases are
worth what they are.  And typically it's around $6- to
$750,000, in my experience.

          THE COURT:  Regardless of the size of the underlying
entities that are parties to the merger?

          MR. MONTEVERDE:  Yeah, there's actually case law.
We've tried to argue the opposite.  We've tried to argue in a
case like this, where the transaction of equity was $9 billion
that the fee should be larger.  And courts -- and I should say

1    this is mainly out of Delaware Chancery Court -- have said

2    pretty much any entity above $100 million and on is going to

3    have the same benefit on attorney's fees.

4              THE COURT:  What's the total equity involved in the

5    merger of the three companies?

6              MR. MONTEVERDE:  9 billion with a B, roughly was 3

7    billion each.

8              THE COURT:  Okay.

9              MR. MONTEVERDE:  So this was a large transaction,

10   which is, again, I don't think the Court uses that, but I

11   think that if the Court were to consider that, it emphasizes

12   that the benefit was for a large combination.  And there were

13   over 140,000 notices.  So that's how many people benefit from

14   this information.

15             THE COURT:  Let me hear from defense counsel.

16             MR. MUNDIYA:  Good morning, Your Honor.

17             THE COURT:  Good morning.  Talk to me about the

18   disclosures that your opponents persuaded you make that you

19   weren't evidently previously inclined to make in order for all

20   of this to go through.

21             MR. MUNDIYA:  Your Honor, they -- they obviously

22   filed a lawsuit, they filed an application for some interim

23   emergency relief seeking disclosures about the projections and

24   the core FFO and a bunch of other things.  And they were

25   pretty aggressive about those disclosures.  We decided that it

made sense to expand those disclosures because we didn't want
the risk of an injunction.  This was an important deal, I
think, for all of the defendant corporations.  And the risk of
a injunction simply wasn't worth it.

        And it -- these disclosures, we could readily make.
We had them.  We didn't think we had to make them in the first
instance.  But given the risk of an injunction, a small.  Risk
to be sure, but a risk, that it wasn't in the defendant's
interest to take that risk.  And we decided to go back, look
at what else we could put in the proxy statement and made the
supplemental disclosures.

        THE COURT:  So you're in a complicated spot here, as
counsel in your position frequently are.  You want the
settlement to go through.

        MR. MUNDIYA:  We do.  We do.

        THE COURT:  Your principals have committed to it.
And I understand that completely.  But I have separate
responsibilities.

        MR. MUNDIYA:  And --

        THE COURT:  And in pursuit of those, I have
questions, to which I need candid answers from you as an
officer of the Court.  And I know you'll provide them.

        MR. MUNDIYA:  Absolutely.

        THE COURT:  How bad of a fight was it really to
persuade you and the others to turn over the information?  It

strikes me that it wasn't much.

MR. MUNDIYA:  It was a few days of --

THE COURT:  Yeah, a few days.  That's what the calendar would suggest.

MR. MUNDIYA:  You're absolutely right, Your Honor. It was a few days of negotiations.  There was a lot of back and forth on the issue of free cash flows.  They insisted on those.  We pushed back.  There was -- it was a few days, very candidly, Your Honor.  There was a few days of pushing back. And Mr. Monteverde may get to this, with respect to one of the other defendants there was some disclosures with respect to the discount cash flow analyses by the Goldman Sachs firm. That didn't involve our clients.  But that raised issues.  And there was a lot of back and forth on that issue, which didn't involve the current defendants.  But it was a few days of hard fought negotiations.

Thereafter, Judge, once we entered into the settlement agreement, there was extensive discovery to be sure.  There were depositions of our bankers, of our directors.  So Mr. Monteverde is correct on that score, that they did do a --

THE COURT:  They did their diligence.

MR. MUNDIYA:  They did their diligence.  They did their diligence.

THE COURT:  And tested the representations.

1          MR. MUNDIYA:  Right.  Right.  And they tested the

2     viability of a potential claim for price.  And they asked the

3     directors, what else did you do?  What other things did you

4     look at?  What valuations did you see?  I mean, they asked the

5     type of questions that they normally ask.  But, you know, we

6     support the settlement.  We think it's fair.  We think it's

7     reasonable.

8          But to answer your question directly, there were

9     negotiations.  This is not a collusive settlement by any

10    means.  They pushed.  We pushed back on some.  And we came to

11    a meeting of the minds on the disclosures you see before

12    you.

13          THE COURT:  I appreciate it.  Mr. Dvores, do you

14    want to speak first or Mr. Robinson do you want to speak

15    first?

16          MR. ROBINSON:  I will defer to Mr. Dvores.

17          MR. DVORES:  Thank you.  So, Judge, I would like to

18    continue on your first thought that this case represents a

19    conflict where attorneys are representing two or more of the

20    parties where they should have only represented one.  And the

21    excuse given that we have some joint interests in disclosure

22    is not enough to overcome the fact that the individual

23    shareholders in each of these individual companies had

24    directly -- had direct interests which conflicted with the

25    shareholders of the other two companies.  It's already stated

1    in the complaints that were made by each of these parties that

2    each one was representing someone, some group of shareholders,

3    and they thought that their company was in a stronger

4    financial position than the other two companies.

5           So let me quote from their complaints.  This is from

6    the Boothe Northstar Reality Finance Corporation complaint.

7    The proposed transaction is not in the best interest of NRF

8    shareholders.  The merger -- quoting, the merger consideration

9    fails to adequately compensate NRF's stockholders in light of

10   the company's recent and historical performance and strong

11   growth prospects, as shown in NRF's stock chart for the year

12   to date.  Despite NRF's strong stand alone prospects, the

13   board has agreed with a three-way merger of purported equals,

14   in quotes, with Colony and NSAM.  If the proposed transaction

15   is consummated, NRF's current shareholders will only own 33.9

16   percent of the combined share entity.

17          Furthermore, if the proposed transaction is

18   consummated, NRF's executives will receive significant amounts

19   in executive compensation, money which otherwise would have

20   remained in the coffers of the combined company.  In sum, NRF

21   is well-positioned to generate significant earnings in the

22   foreseeable future.  Despite NRF's bright financial prospects

23   the board now agreed to combine the company with two potential

24   weaker entities and without obtaining an adequate premium for

25   their company's stockholders.  It is therefore imperative that

NRF and the stockholders receive all material information concerning the proposed transaction, so that they may properly evaluate whether or not it is in their best interest --

THE COURT: So even at the end of the day, even at that high water mark of when they're drafting their complaint, the petition, the request, the demand in the lawsuit is for disclosure.

MR. DVORES: Right. But the disclosure here is limited to the information that's contained in their notice that was sent to shareholders, it was filed with the SEC. There may well have been other issues to have been disclosed. But these plaintiffs' attorneys weren't interested in other issues. They weren't interested in the issue of breach of fiduciary duty. They said they wouldn't file under Delaware law. They didn't want any part of looking for breach of fiduciary duties.

Well, in fact, their complaint, in between the lines, says there's a breach of fiduciary duty, in that the executives of this company were getting undue compensation as a result of this merger. So there was a breach of fiduciary duty. Or at least there is a colorable claim of that. And that's going to be extinguished if this settlement goes through.

THE COURT: Tell me what you think about the fees that they're seeking.

1    MR. DVORES:  I'm not really competent to talk about

2  fees, because I have no experience with billing.  I was a

3  legal services attorney, we never charged for our service.

4  However, it seems to me that there's a lot of duplication of

5  effort in this case.  If you look at the complaints that were

6  filed by each of the plaintiff parties as class members --

7    THE COURT:  Maybe the fact that there's all that

8  duplication reflects -- maybe that reflects on your first

9  argument as to how -- the extent to which they were looking

10  after their separate interests.

11    MR. DVORES:  Well, my -- the way I read it is each

12  of those complaints made an identical statement about the

13  separate interest of the particular group of shareholders that

14  they claim to be representing.  But they never pursued those

15  claims of inadequate compensation, which would result in a

16  better ratio of shares that were going to be given in the new

17  company, to their particular group of shareholders.

18    They never pursued that.  They only pursued the

19  issue of disclosure.  And the disclosure was limited to, as

20  Mr. Monteverde was saying, this very interesting but very

21  complex issue of cash flow accounting, EBT accounting, all

22  these various measures, all of which are used.  But you single

23  out and you want to use this one.  Or if it wasn't disclosed

24  you should have used it.

25    Okay.  But the point is they didn't pursue the

claims that they could have pursued in terms of other matters.
They were only focused on this one issue. And this was the
end of it. I'm saying to you, that because they were united,
they never got to represent their clients independently as
they would have been if they weren't united. And that's the
issue for me, that there's that conflict of interest that
these attorneys just ignored. This is basic.

THE COURT: Thank you, Mr. Dvores.

MR. DVORES: And if I may say something --

THE COURT: Yes, sir.

MR. DVORES: On the notice itself, the SEC filing
was done December 9th, 2016, the shareholder vote was done on
December 20, 2016. The filing of the notice was really not
effective notice to the shareholders. That notice really is
given by the brokerage firms, which hold the stock in street
name, which then do a mailing of the notice to the
shareholders. So, in fact, there was really no notice given
here.

THE COURT: Well, what does the case law say,
though, about notice to brokers?

MR. DVORES: You know, I don't know the case law.
All right. I'm simply saying practical notice. All right.
There may be legal notice. But as far as if you're going to
rely on legal notice, you're relying on a fiction, because
it's never going to get to the actual shareholders who have to

1     vote.  You're doing all of this to benefit the shareholders

2     and yet you're doing it in a way which doesn't benefit them --

3          THE COURT:  But the shareholders have made the

4     decision about how they want to acquire and hold the stock;

5     right?

6          MR. DVORES:  Actually, they don't.  Because under

7     the present way that stocks are bought and sold, everything is

8     done by broker entry and it's held in street name.  There's no

9     registered stock anymore.  And I happen to be a stockbroker.

10    Okay.  So, in fact, they had to rely on distribution by way of

11    brokerage firms, clearing firms, to get this notice out to the

12    individual shareholders.  All of which takes time.  It takes

13    weeks.

14         It took weeks for the notice of this proposed

15    settlement to get to me, to Mr. Hoffman, to all the other

16    shareholders.  It doesn't happen that quickly.  But all I'm

17    saying is, if you're talking about this notice being so

18    material, it wasn't in fact actually delivered to the people

19    they say that they were intending.  The only way that they

20    could have done it, if they were really serious about getting

21    notices out.  They should have made arrangements with the

22    defendants to delay this -- the merger vote.  Maybe then there

23    could have been a chance for this information to get into the

24    hands of the stockholders.  But to give it just the time from

25    December 9th to December 20th doesn't mean anything.  It's not

1   going to work.

2          Beyond that, when you get your notice of the merger,

3   and your right to vote on it, you get it months before the

4   actual merger vote.  Most people when they get it, if they're

5   going to do anything with it, they're going to do something

6   with it that time they get the notice.  Many people,

7   therefore, who got the notice, much earlier, entered their

8   vote.  They didn't wait for the last week to enter their vote,

9   they entered their vote when they got the original proxy

10  statement and notice that there was going to be a vote on the

11  merger.

12         The question I would ask the plaintiffs attorneys

13  is, how many votes were changed after the date of December

14  9th?  How many shareholders wrote in or otherwise notified the

15  proxy agents that they wanted to change their vote?

16         THE COURT:  Which way would favor your argument, a

17  lot or a few?

18         MR. DVORES:  Very few.

19         THE COURT:  Well, Mr. Monteverde, you get the

20  opportunity to answer that question and respond to the other

21  points that Mr. Dvores has made before we turn to Mr.

22  Robinson.  Go ahead.

23         MR. MONTEVERDE:  Sure, I will.  I think we have a

24  little bit of a disconnect on really the law.  Let me start

25  with the notice issue, I guess.  The disclosures need to be

made pursuant to Securities and Exchange Commission rules 10

days before the vote.  We did it 11 days before the vote.

That's the law.  They don't get mailed.  They get disseminated

immediately through a filing of a form 8-K with the Securities

and Exchange Commission.  We're operating in efficient

markets.  That information is captured in the market the

second you file it.  And that's what is using for shareholders

to casting for votes.  Because what shareholders look at is

how the price of their stock gets effected.

From personal experience I can tell you, if you

disclose valuable information, the price will be affected.  It

happens.  It's not something that happens regularly.  But

that's the kind of markets we live in.  So I think there's a

disconnect of what's required.  Everything done here was done

as the law states.  So arguing that should be differently,

well, that's not the law.  And we follow the law.  And the

Court has to follow the law.

The mailing of the notice, I think there was

confusion.  That's the settlement notice.  That was also

mailed pursuant to what courts have approved in the past,

which goes to brokers, as Your Honor was discussing with Mr.

Dvores, that was done here.  There were over 141,000 notices.

So the filing was done the same way it's done in every

transaction that has been done in the past, that has supported

approval of settlement in every court in this country, federal

and state.  And in every case that we cited to Your Honor, I
think page 22 and 23 of my Power Point.  That's just the way
it's done.  We follow the law.

As to the claims, again, I wish I could walk into a
courtroom and say, Your Honor, price is not fair and therefore
I can defeat a motion to dismiss.  That's not the law.  I
mean, I would wish for that.  You actually have to have
liability.  And we are actually pursuing right now a case like
that in Rockville, Maryland, in front of Judge Rubin, the
American Capital litigation.  Which we ended up just settling
actually a couple weeks ago and recovering %17.5 million for
shareholders.  I like those cases, Your Honor.  I get paid
much better in those cases.  I have an incentive to find
viable claims.  And my history shows it that, one, I know how
to find it and that when I find it I pursue it.

So the notion that there were claims is just
erroneous.  Legally there were no claims.  We didn't file a
claim for state law, and this recitation of facts, that the --
you paint a picture when you draft a complaint.  That these
companies could be more valuable and that's why you need the
projections.  You tie things together.  That's what we do as
lawyers.  It's not every allegation in a complaint is
actionable.  It's what you use to draft a complaint in order
to demonstrate to a court why you want information you were
asking for.  In this case we wanted projections so we could

1  assess the value of each entity.

2          There was no conflict.  Just because we were

3  coordinated doesn't mean that if one of us thought there was a

4  better case we would not pursue it, of course we would.  We're

5  officers of the Court, as the Court pointed out earlier, we

6  have an obligation.  But more importantly, we have an

7  incentive.  We do a lot better if you can find a viable claim

8  for damages.

9          I think those were the two highlighted points I

10  noted.  I don't know if --

11          THE COURT:  I think you've addressed them.  Thank

12  you, Mr. Monteverde.

13          MR. WILSON:  Your Honor, can I just --

14          THE COURT:  Yes.

15          MR. WILSON:  James Wilson of Faruqi for -- I think

16  it was --

17          THE COURT:  You can just go to podium there, Mr.

18  Wilson.

19          MR. WILSON:  Just very briefly.  I just wanted to

20  touch on --

21          THE COURT:  Yes, sir.

22          MR. WILSON:  I just to assure the Court that at all

23  times plaintiffs counsels' loyalties were to the shareholders

24  they represented in each of the cases.  We filed originally in

25  the Colony case with Mr. Monteverde.  A shareholder came to

1    us, we later filed in the NRF case.  We represented solely the

2    NRF shareholders in that litigation.  That was formalized in

3    the preliminary approval order where my firm was appointed

4    class rep -- class counsel for the NRF, Monteverde was

5    appointed class counsel for Colony, and the Ademi O'Reilly

6    firm was appointed class counsel in the NSAM case.

7              That is the formalized -- formalization of the

8    reality that there was no actual conflict, Your Honor.  Our

9    loyalties ran to each of our class members.  And that is how

10   we conducted ourselves in the litigation.  I just wanted to

11   emphasize that and address Mr. Dvores's argument on the

12   conflicts issue.  And I believe the Court recognized that in

13   the records that we submitted we devoted our time to

14   investigate the claims, with respect to the release, for the

15   NRF shareholders.  And each firm did the same thing.  Thank

16   you.

17             THE COURT:  Thank you, Mr. Wilson.

18             Mr. Robinson.

19             MR. ROBINSON:  Good morning, Your Honor.

20             THE COURT:  Good morning.

21             MR. ROBINSON:  If I may, I'm just going to address a

22   couple issues that have already come up.  And then sort of

23   summarize a couple issues that were in Mr. Hoffman's

24   objection, but not repeat the entire objection.

25             THE COURT:  Right.

1          MR. ROBINSON:  So if I understood sort of correctly

2     the chronology of the litigation after it commenced through

3     this interim period, the supplemental disclosures, it sounded

4     as if potentially there were damages initially, but those

5     claims went by the wayside.  And Mr. Monteverde explains that

6     he -- after their investigation there are no damages.  So

7     clearly the fundamental question, if there are no damages,

8     does the Court even have jurisdictions?  The Court's a limited

9     court.  It's true the state court might have jurisdiction.

10    But if we're just talking about what, in essence, if I'm just

11    sitting back and listening to that argument, it's an

12    informational case.

13          And as the Court is aware, and Mr. Hoffman didn't

14    object on this basis per se, I'm just raising it listening to

15    the argument, Your Honor.  I just sort of wonder whether or

16    not the Court even has jurisdiction over what the plaintiff's

17    counsel has argued this morning is essentially an

18    informational case at best.  Without even getting to the

19    merits about whether the information was valuable and all that

20    kind of thing.  So that's sort of one thing I would say.

21          And then they say quite clearly, if there were no

22    claims they would have pursued them.  Well, on that point if

23    there were no claims, why is the release -- Mr. Hoffman did

24    talk about in his objection -- why is the release there?

25    They're releasing all sorts of potential claims.  We don't

know, we haven't articulated what potential claims might

exist.  But it sort of is counter-intuitive to the argument

there was nothing here to pursue damage-wise, but we're going

to agree to a settlement bar.  It's a non optout settlement

that they present to the Court and the classes.

And they -- but the defendants -- and I understand

why the defendants want it, it's a good thing.  And you know,

Your Honor, the few cases that I've had before Your Honor on a

class-wide basis, there's benefit to defendants to getting rid

of uncertainty.  But here you have what is, in essence, at

best, an informational claim.  And whether that's meritorious

or not, don't need to get -- I don't need to get into.  But if

the claims had no value, then why is there a broad release for

the defendants?

THE COURT:  By the same token, the point that you

make with respect to the defendants, and what their incentive

might be here, and why they might be more passive than others

might suggest they should be in the circumstances, what about

a view that the same principle applies to the vast majority of

those who are in the class, and that it is in their best

interest too, and accordingly, I've only got two objectors

here.

MR. ROBINSON:  I'm going to get to that point in a

moment.  But let me, before I get to the notice of the class

and the number of objectors that are here, Your Honor, let me

just make clear for the record, I cast no dispersions on
defense counsel.  And what a defendant typically wants in
these cases, they've achieved in their settlement agreement,
which is bar.  But the point I was just trying to make is, if
there are no damages, as plaintiff's counsel has articulated,
that can be compensable in this case, then why is that a
negotiated term of the settlement?  The first step that the
Court has to consider today --

          THE COURT:  If that is such a problem, though, where
is my prairie fire?  Where's my outrage among shareholders?

          MR. ROBINSON:  Let me --

          THE COURT:  Where's the revolution?

          MR. ROBINSON:  Let me address that, Your Honor, as
best I can, based on the record they've created.  So Judge
Motz gave preliminary approval.

          THE COURT:  Yes.

          MR. ROBINSON:  Judge Motz said in the preliminary
approval order, that they prepared for Judge Motz to sign,
that notice shall go out no, I think, less than 60 days before
today's date.  They filed an affidavit just a couple weeks ago
saying, at least as of October 16th, they're still sending out
thousands of notices to class members.

          So the answer to your question, Your Honor, is
partly sort of the first question that I think you have to
address before you get to the attorney fees, was the

1    settlement fair, reasonable, and adequate.  And I think the

2    notice in and of itself, and the problems with the notice that

3    they've provided testimony to the Court about, bear out the

4    class members don't know what's going on.  They weren't sent

5    the notice timely.  And maybe there's a structural defect in

6    how the investments are held and who initially got the notice

7    and did they get the other addresses.

8         But they never once, Your Honor, came back and asked

9    the Court, Judge Motz or Your Honor, or any other judge, to

10   modify the settlement agreement, to change the date, to change

11   the notice to say, hey, we're having problems identifying all

12   the class members.  Instead they kept sending out notices.

13   And I understand that's maybe in good faith.  But the notices,

14   under their sworn testimony, thousands of them were just a

15   couple weeks ago, after the objection deadline.  The objection

16   deadline, according to the Court order, was in early October.

17        So you know, to the extent that there's not a lot of

18   objectors here, I don't think that -- that sometimes is

19   indicative of a reasonable settlement.  There is an inference

20   and there's a body of case law --

21        THE COURT:  Ton of case law that backs up that

22   principle.

23        MR. ROBINSON:  Right.  And here we have, by their

24   own sworn testimony, thousands of notices sent out after the

25   bar date.  And it's pretty clear in the settlement agreement

1    and the notice, if you do not timely object you will not be

2    permitted to appear at court.  Now, when I'm before Your Honor

3    on that table over there, I always invite the class members to

4    come up whether they objected or not.  But that's -- they

5    don't put that kind of language in our settlement agreements

6    and in the orders of the Court.  But the messaging that went

7    out to the class was late, that went out to the class late

8    without approval of the Court late, was if you don't get it in

9    on time you're not going to be able to be here.

10        THE COURT:  Yeah, but if we afford a modicum of

11   intelligence and energy to the fellow class members, we can

12   reasonably expect that they would raise exactly the point that

13   you're raising, which is wait a minute, the objection deadline

14   was X, and I didn't get notice until Y.  Y came after X.  I'm

15   not sure how much of an inference I should draw from the fact

16   that there's silence in the face of that.  My experience,

17   frankly, is to the contrary, people got beefs, they tell you

18   about it.

19        But nonetheless, I've heard the point.  I'll go back

20   to Mr. Monteverde and raise the question with him about notice

21   and its adequacy, and what inference should be drawn from the

22   fact that there are only two objectors here, when there was

23   evidently a less than perfect process of notification.

24        MR. MONTEVERDE:  Thank you, Your Honor.  The process

25   was perfect, it's the way that process works always.  I think

what they're complaining is something that there is no legal complaint to be had. That's with their brokers. And that's what the law requires and that's what we did. The notice was sent when it's required to be sent per Judge Motz' order. If then other notices aren't forwarded by brokers in a timely manner, that's not our fault. And frankly, Your Honor, they got the notice, we have two objectors here.

THE COURT: What do you say to his point that he contends that you have acknowledged that you were still sending notices --

MR. MONTEVERDE: No, those are forward notices.

THE COURT: Okay. That's what I'm trying to nail down is whether or not those originated with your servicer or whether that is something that's downstream.

MR. MONTEVERDE: It's downstream. It's nothing nefarious. This is how every case -- we used a reputable notice administrator that has done these types of cases, that has been approved by federal courts across the country. The law supports it. And the notice was appropriate. And the fact that you only have two objections out of 141,000 notices that were mailed shows support for the settlement.

But the bigger point is, I keep hearing is, the damages. This was not a damages case because it was an Exchange Act claim. And maybe there's a misunderstanding of the law. But that's what we sought an injunction. And one of

the things I need to say when I file an injunction, Your

Honor, and Your Honor knows this, I have no remedy in law for

damages. That's called irreparable harm. I said that in my

motion to Judge Motz. I mean, we're just arguing about

something that is just not realistic or supported by law.

THE COURT: Thank you, Mr. Monteverde.

MR. MONTEVERDE: I wanted to clarify that. Thank

you.

THE COURT: Thank you very much. Mr. Russell -- or

Mr. Robinson, I'll let you finish up. And Mr. Dvores

evidently wants to get in something on this point as well.

I'll hear from him.

MR. ROBINSON: If I may just add, Your Honor. In

the affidavit that they presented to the Court on October

19th, 2017, it says in paragraph 5, that's document 22-1 in

the 3742 case, from August 29th, 2017, to August 16th, 2017,

GCG, I think that's the provider they used, Your Honor,

received from the nominee holders 57,487 additional names and

addresses of beneficial owners of NRF common stock. They're

testifying -- basic due process in a class settlement, you're

asking the class members, and the absent class members who Mr.

Hoffman has also objected on behalf of, to waive their claims,

but they didn't -- they've acknowledged.

Now, I understand that maybe the process in the

securities case is little different for getting notice to

people.  But shouldn't they have thought of that, Your Honor,
to preserve due process, and the rights of the absent class
members, when they ask for the particular timetable that they
ask for, if they knew that they were going to have to get
addresses after the fact, additional addresses and send out
notices to people who didn't get it, after the fact, then
perhaps they should have asked for more time.  But you know, I
point out again, Your Honor --

          THE COURT:  Let's just nail that down.  Mr.
Monteverde, please explain?

          MR. MONTEVERDE:  This is the standard schedule that
has been approved a thousand times before.  And has been found
to be legally acceptable for due process.  The Supreme Court
has accepted --

          THE COURT:  That's fine, but rather than tell me
that, tell me the mechanics of what happened with respect to
the notices.  What is this additional time period during which
your administrator was reporting they received additional
addresses from you and then mailed out.  What was that about
and when did that occur?

          MR. MONTEVERDE:  Well, I would have to first of all
say we don't handle the notice, the notice is handled by the
administrator, which works with the defendants to get the
record list.  My understanding is they get the list and that's
where your notices go out that you're required to give

legally.  That's a professional courtesy, you then forward

additional notices that brokers request, but that's not

required under the law.  We don't have to do that.  That's

what the --

THE COURT:  So the initial notices that were sent

outside the 60 day time period, and I'm going to ask the

defendants about this in a second, did occur?

MR. MONTEVERDE:  Yes.

THE COURT:  It's just that in most instances that's

not going to the ultimate beneficial owner of the stock.

MR. MONTEVERDE:  Right.

THE COURT:  It's going to the representative, it's

going to their broker.

MR. MONTEVERDE:  And nowadays most brokers, for

example, most individual have internet accounts and they get

those notices immediately via e-mail, for example, there's

people that still want it forward.  But the law requires the

record holders be given notice.  And the fact is we have

objectors.  And I can tell you, I can represent to the Court

we haven't received any late objections, which the Court could

still have considered.  I haven't received any phone calls

saying, we're objecting, or we want to object, we just

received the notice, which was the -- all the notices have

been delivered.  I mean, we're arguing over something, again,

that there's no legal ground for it, Your Honor.  This is

1    acceptable procedure --

2          THE COURT:  Let me hear from Mr. -- how do I say it

3    Mundiya.

4          MR. MUNDIYA:  Mundiya, yes, Your Honor.  Your Honor,

5    this is typical.  In terms of the mechanics, you nailed it.

6    Basically the notices go out, in accordance with the judge's

7    order, after the 60-day period.  Then the nominees say, okay,

8    these are the people -- these are the names and addresses that

9    we have, you may want to, you know, you have to then submit

10   additional -- those notices to these names and addresses.  But

11   in terms of the due process issue, what the law requires is

12   that those notice get mailed out to the only entities that we

13   have visibility to -- on rather -- has visibility on, which is

14   the nominees.  And we rely upon those nominees to tell us

15   names and addresses.

16         And then Garden City, which is a very reputable

17   entity that does this, you know, has done this for us in

18   thousands of cases, hundreds of cases, you know, this is the

19   way it happens.  And it's only because we don't have

20   visibility into who those shareholders are.  And once we get

21   that information, once Garden City gets that information,

22   those notices then go out.

23         THE COURT:  I got it.

24         MR. MONTEVERDE:  One point I want to make, Your

25   Honor, and I think is important.  The form 8-K we had issued

1    also on December 9th disclosed this litigation --

2              THE COURT:  Are you talking about the 8-K?

3              MR. MONTEVERDE:  Yes, back then.

4              THE COURT:  Yes.

5              MR. MONTEVERDE:  So that's more notice that

6    shareholders know there is ongoing litigation.  I can assure

7    you that when you have shareholders who think a case should be

8    settled for different terms, or there should be a claim

9    pursued, those lawyers out there, like myself, that practice

10   in this space, will start getting involved.  So there's also

11   constructive notice.  I'm just saying, people knew about this

12   case.  This is not like a -- we're not trying to hide

13   anything.  But I will echo Mr. Mundiya, we follow process as

14   required by law as well.

15             THE COURT:  Mr. Robinson, what else did you want to

16   cover?

17             MR. ROBINSON:  Just in sum on that issue and then I

18   have one other minor issue, Your Honor, to summarize for

19   today.  And that issue, the issue that I'm raising, is due

20   process in this case.  Not due process as to the notice that

21   went out, the supplemental notice.  Due process for this case,

22   you're asking the class members who cannot opt out, who did

23   not get the notice within the Court ordered time.  And

24   according to their proffers --

25             THE COURT:  But they did get the notice.

MR. ROBINSON:  Well, according to their proffers,
they understand the system is they sent them to the first
person that they knew.  But they also know from their
experience that they would get supplemental addresses for
people like Mr. Hoffman, who would get -- then they would
resend or they would send the notice out to Mr. Hoffman again.
I'm just saying, Your Honor, under due process principles,
they know that outcome is inevitable, why condense this down
to such a short time period?

Moving on, if the Court finds that the settlement
the fair, adequate and reasonable, then you can get to the
attorney fee issue that you brought up.  And the only issues I
would raise there --

THE COURT:  I so find it was fair, adequate, and
reasonable.  And now I do want to get to the attorney's fees,
because I think that's the issue today.

MR. ROBINSON:  The three things, not to repeat what
was said earlier -- or four things that I would just point
out.  I don't believe that this Court has recognized the
Laffey matrix as the correct thing.  It might be used on a
cross check, Your Honor.  But the first step that most -- that
Your Honor, I believe looks at and your colleagues look at,
are what the Appendix B says in the local rules for reasonable
rates.  They've sought attorney fees for attorneys who aren't
entered into the case.  They appear to be duplicative entries.

1    And we think that they're seeking excessive fees for

2    nonattorneys in the case.  And we just we think it's grossly

3    excessive, the number of hours for a case that really didn't

4    exist very long.  Not much work was done in the case.  There

5    was no dispositive motions filed or anything along those --

6            THE COURT:  How reasonable is it for the Court to

7    also look at what was ultimately accomplished through the

8    lawsuit?

9            MR. ROBINSON:  I think under the *Johnson* factors you

10   can consider that, Your Honor.  They address some of the

11   *Johnson* factors, I believe in the case.  But, you know, so you

12   can look at in terms of the -- I believe the case law is, and

13   under the *Johnson* factors, you can look at their

14   reasonableness of the attorney fee award to the outcome that

15   was achieved for the class.  Remembering again the outcome

16   here was a supplemental notice for claims that may not have

17   had any value.  And I'm not sure that there's anything really

18   before the Court to quantify what the value of that notice

19   is.

20           THE COURT:  Well, that's a really hard problem;

21   isn't it?

22           MR. ROBINSON:  Correct.

23           THE COURT:  But on the other hand, if we didn't

24   think that disclosure had value, I suppose we wouldn't require

25   it under our extensive legal apparatus for regulating the

securities industry, would we.  So it must have some value.

     MR. ROBINSON:  Unless the Court has any other questions for me that summarizes what I wanted to present to the Court.

     THE COURT:  I started to get into the metaphysical and that's when you wanted to sit down, Mr. Robinson.  Okay.

     Mr. Dvores, you want to say something about the fees?

     MR. DVORES:  I want to say something, yes.  Not necessarily limited to what he said about the fees.

     THE COURT:  Well, the only topic that's on the table is the fees.

     MR. DVORES:  All right.  You said before, and he made the point, that this case turns a lot on the fact that there are only two objectors that have come forward here.  And somehow that means that the other parties are not interested, because the other parties didn't see any issue here.  Well, let me just quote or cite one case that I was personally involved with, where there were 112,000 -- it was a federal case in U.S. District Court, Southern District of Manhattan, New York.

     There were 112,000 notices mailed out in this case, In re: Tower Group International Litigation, it was a merger case.  It was only one objector of the 112,000 notices that were mailed out, that was myself.  As soon as I got involved

1    with the case and filed my objection, somehow the attorneys

2    got together with the defendant attorneys and they reduced the

3    claim from $395,000 in attorney's fees down to $250,000.  The

4    Court said, sorry, I have to look at it myself.  I'm not

5    persuaded by what you have consented to among yourselves.

6         The Court then reviewed all of the disclosures and

7    found that under the Court's finding they were of marginal

8    value.  They were not corrective of anything.  And determined

9    that -- reduced the fee down to $75,000 for -- and this was

10   two sets of attorneys, one Robbins Arroyo from California, the

11   other one Rice Law from New York City.

12        I still thought that was excessive in the situation,

13   because I had found in the course of doing my research that

14   there were SEC filings that showed that this company that had

15   been acquired and which the plaintiffs attorneys were claiming

16   had received inadequate compensation for the shareholders, it

17   was phony.  There was filings that showed that this was a

18   failing insurance company.  It was going out of business

19   basically.  And they had said so in filings.

20        I had filed an appeal with the 2nd circuit.  After I

21   filed my brief the plaintiffs' attorneys came to me, I never

22   said anything about settling.  I wanted to see this case

23   through.  They said, you won, we can't argue with you.  And

24   what will you take for your time?  I said, I don't want

25   anything for myself.  Well, they said we're going to give back

the $75,000 and dismiss the case. It will be moot. The 2nd
Circuit will have nothing to decide on, the case will be
dismissed. So I said, okay. I took half of the money,
$37,500 for charity.

This shows nothing, the fact that it's only two
people that wanted to object. The fact is, if this case
doesn't involve money, which it doesn't, most people when they
get this notice, when they look at how complex it is. When
they look at the fact that it says NSAM on it, and their case
involves NRF, they're going to say what's this all about and
throw it in the wastebasket. When they do read it, if they
did, they'll find that the accounting business is so complex
they can't understand it. They need help. But by golly, they
don't have help. Because it's all over. There's two -- it's
just too expensive and too soon for them to react.

And to file an objection takes some degree of time.
I can tell you. And I'm a former attorney -- I am an
attorney, I'm retired for 35 years. So I don't really know
anything about the modern law. But I do know some modern
concept -- some old concepts of fairness. And pursuit of your
fiduciary duty to your client. These attorneys took this case
and shaped it into a disclosure case under the federal law,
when they could have taken the same facts and shaped it into a
breach of fiduciary duty under Delaware law, because they
said -- in their own complaint there's a question of excessive

compensation, taking advantage of the share owners by
management.  This is all common place stuff that happens all
the time.  But they never pursued it.  And that's the question
I have.

    THE COURT:  Thank you, Mr. Dvores.

    Mr. Monteverde, let me tell you that where I end up
on this is actually in a very different place from where the
objectors are.  My view is I don't think there was much here
from -- on the plaintiff's side.  And I think you pursued a
resolution of the dispute.  I think relatively quickly.  You
achieved one.  You had defendants that had every incentive to
remove impediments and to get their deal done.  And I, in
looking at the total picture here, don't see that there was
some enormously tall or difficult mountain that was climbed.

    Not that you're not, obviously, capable of that.
I'm sure that you are.  You've done a fine job here this
morning representing the -- your interests.  And those of
the -- your clients.  But at the end of the day, it's going to
take some Herculean effort on your part and that of your
colleagues to persuade me that this is a million dollar fee
case.  Have at it.

    MR. MONTEVERDE:  I don't think it's a hard thing to
do, Your Honor.  Maybe it's because I'm a finance person
before going into law.  And I understand how this is very
important for financial markets, Your Honor.  I'll make a

quick point, not to start telling tales.  Just two weeks ago I

was before the 9th Circuit.  I'm trying to change the law on

tender offers, 14(e) statute, because the standard is

scienter, I believe it should be negligence.  So I believe in

what I do Your Honor, and my record shows it.

The markets without projections, the stock is

worthless.  And defendants sometimes fight very hard, because

they want a deal to go through to preserve employment, or

because they have a buyer that they think the CO will get a

job with, and they don't show the projections.  Or what they

do, and we have experience handling those cases also, they

change the set of projections six months before the deal is

reached.  They just lower expectations.

Projections is what makes the stock market work,

Your Honor.  And that's why we're entitled for multimillion

dollar fee.  The reason why I'm not asking for a multiple

million dollar fee, because there were three sets of

projections, and I would argue under *Affymetrix*, the *Douglas*

*versus Witney* case that I just did in the Northern District of

California last year, I got paid $1 million.  I would say I

should be getting $3 million.  One for me, one for Mr. Wilson,

and one for Mr. Ademi.

And I was ready to walk into court asking for that.

I had a negotiation with Mr. Mundiya.  Who I've had him as an

adversary and we've had fights in the past.  So it's not like

we're best friends.  And he has no incentive whatsoever --

MR. MUNDIYA:  We're not friends.

MR. MONTEVERDE:  We're not friends.  -- has no incentive to overpay me.  The negotiation --

THE COURT:  Well, he has every incentive --

MR. MONTEVERDE:  No he doesn't.

THE COURT:  Absolutely he does.  To close his deal.

MR. MONTEVERDE:  No.  You know what he has an incentive to do?  And that's what we did here, Your Honor.  We reached a settlement without a fee number.  Mr. Mundiya and I were negotiating the fee until the day the notice had to go out.  That's why there was that supplement to the back.  To the last minute we were negotiating.  He didn't want to pay me, I wanted 3 million.  And I'm not going to get into the back and forth, it's inadmissible and it's irrelevant.  But we had a deal, and the disclosures already done.  We had a deal that I was going to give him a release because I already conducted discovery and so did my colleagues, without agreement on the fee.

I can assure you they had no incentive whatsoever.  The reason they agreed to a number is because they knew I would come into this court, with all the cases on my slide, 22 and 23, and show Your Honor exactly identical cases paid a lot more than $4- or $450,000.  The reason we're asking for 450,

and Mr. Ademi is asking for that, instead of 400 like the
rest, is because they had the Goldman error, so they deserve a
little bit more money. But I think Your Honor is thinking,
well, it's a $1,250,000. Yes, but there's three cases.

THE COURT: Yeah, but is it three cases and should
it be treated that way?

MR. MONTEVERDE: No. They are three cases. We were
coordinated. This happened in Atlas Energy. Atlas Energy was
with Atlas Pipeline, we're doing a combination. And there
were, I think, four or five law firms in there, in both. And
I think the fee paid there was $1 million. $500,000 for Atlas
Energy, $500,000 for Atlas Pipeline. Here we're getting paid
less. And that was in state court in Pennsylvania, which is a
very difficult jurisdiction on a contested fee. In federal
court it's easier for a plaintiff to get paid for an Exchange
Act claim.

And defendants have an incentive not to pay. And,
Your Honor, I want to make sure the record's clear, it's not
true they have an incentive to pay us, the opposite. They
don't want to pay us well because they want to avoid getting
sued again for their other clients. If they're known as
people that pay a lot of money, they're putting a target on
their client's back. And the negotiation here was ruthless,
Your Honor. We were on the phone. We were -- there were --

THE COURT: You all look badly beaten to me. You

1    haven't eaten in weeks.

2         MR. MONTEVERDE:  Your Honor, just because we

3    preserve our good looks, that has nothing to do.  No, but in

4    all seriousness, Your Honor, this is done by lawyers on both

5    sides, we know what we're doing.  And we fight for a living.

6    I have cases where we're appealing, I have cases where we are

7    set for trial, I have cases we have settled, I have cases that

8    I lost.  These is what we do.  We're not getting paid -- I

9    want Your Honor to give me the entire fee.  And giving me the

10   entire fee is not a windfall.  It's just what's fair.

11        And, frankly, I should get paid more, Your Honor.  I

12   have authority.  And just to make that point, on page 15 of a

13   reply brief talks about it, the Appendix B.  Those are civil

14   right cases where it is a fee shifting.  That's not the case.

15   This is not a fee shifting.  This is a contractual, we have

16   reached an agreement that defendants will pay the fee up to

17   $1,250,000 for all three cases.  And we're asking that Your

18   Honor pay it.

19        And we have expenses.  I have a chart.  I know my

20   Power Point was not the success I was hoping for.  But slide

21   21 shows Your Honor we spent $37,196.50.  That's money out of

22   our pocket.  We spent it before we reached an agreement,

23   because that's for filing the case, for financial advisors we

24   retained, for depositions, for travel to those depositions.

25   The deposition I took were in Tampa, Florida, Your Honor.

1          And just to give you a sense, it wasn't let's go to

2     Florida and make a weekend out of it.  I flew into Tampa in

3     the 6:00 a.m. flight.  I didn't even go the night before to

4     save money for the clients, so we don't have a hotel charge.

5     I went to a Marriott right inside the airport, so I didn't

6     even pay for a taxi to go to an office.  Mr. Mundiya was

7     awaiting me.  And we had a room with not even windows, Your

8     Honor, with the deponent there.  I conducted the deposition.

9     And both Mr. Mundiya and I rushed back to take separate

10    flights, we actually ended up going to different airports,

11    because we're on the clock.  We're working.  I have other

12    cases, Your Honor, I'm not here to make vacation out of going

13    to take a deposition.  That's how we handled this case.  We

14    were very efficient.  And yet with that efficiency we still

15    incurred $37,000 out of my pocket that I may never get back.

16          THE COURT:  Thank you, counsel.  I need to start a

17    sentencing hearing here in nine minutes.  I have heard what I

18    need to hear.  I am not prepared to enter the agreement or the

19    order that has been proposed.  I will signal counsel that I

20    would expect to enter an approval of the global arrangement

21    provided that the total attorney's fees that were submitted

22    amounted to a million dollars or less.  I'll look forward to a

23    resubmittal, ten days, Counsel, and expect to proceed to a

24    conclusion of this on the papers without a further hearing.  I

25    know counsel have heard the signal that I have sent.  Thank

1    you.

2            MR. MONTEVERDE:  Okay, sir -- Your Honor.  Thank

3    you.

4            (The proceedings were concluded.)

5

6            I, Christine Asif, RPR, FCRR, do hereby certify that
     the foregoing is a correct transcript from the stenographic
7    record of proceedings in the above-entitled matter.

8                    _____/s/_____
                        Christine T. Asif
                      Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

< Dates >.
August 16th, 2017
    36:17.
August 29th, 2017
    36:17.
December 1st 8:7.
December 20, 2016
    23:14.
December 9th 25:1,
    25:14, 40:2.
December 9th, 2016
    23:13.
October 16th
    32:22.
October 19th, 2017
    36:15.
$1 47:21, 49:12.
$1,000 15:11.
$1,250,000 50:18.
$1,250,000. 49:5.
$100 16:3.
$250,000. 44:4.
$3 47:22.
$37,000 51:16.
$37,196.50. 50:22.
$37,500 45:5.
$395,000 44:4.
$4- 49:1.
$450,000. 49:1.
$500,000 49:12,
    49:13.
$500,000. 13:21.
$6- 15:19.
$600 14:20.
$600,000. 13:25.
$700,000. 13:23.
$75,000 44:10,
    45:2.
$750,000 15:20.
$750,000. 13:24.
$9 15:25.
$950 14:18.
$950. 14:21.
%17.5 27:12.
.
.
< 1 >.
1.8 14:2.
10 26:2.
10. 11:7.

101 1:48, 2:47.
10th 6:3.
11 11:19, 26:3.
112,000 43:20,
    43:23, 43:25.
12 11:19.
13 11:3, 11:19.
140,000 16:14.
141,000 6:10, 26:23,
    35:21.
15 50:13.
16-3282 3:7.
16-3742 4:4.
16-CV-3282 3:24.
16-CV-3742 3:19.
.
.
< 2 >.
2 6:10.
2.1 14:2.
2017 1:41, 6:3.
20th 25:1.
21 50:22.
21201 1:49, 2:48.
22 27:3, 48:24.
22-1 36:16.
23 27:3, 48:25.
2nd 44:21, 45:2.
.
.
< 3 >.
3 16:7, 48:16.
3,000 15:18.
300s 14:23.
33.9 20:16.
35 45:19.
3742 36:17.
3745 4:8.
.
.
< 4 >.
400 49:2.
450 49:1.
4th 1:48, 2:47.
.
.
< 5 >.
5 36:16.
57,487 36:19.
.

.
< 6 >.
60 32:20, 38:7.
60-day 39:8.
6:00 51:4.
.
.
< 8 >.
8-K 26:5, 40:1,
    40:3.
.
.
< 9 >.
9 16:7.
9th 47:3.
=Affymetrix 13:13,
    47:19.
=bry 13:24.
=dandy 12:21.
=DPL 13:22.
=efficient 8:2.
=forteny 47:4.
=gang 24:9.
=lackey 41:21.
=lafferty 14:13.
=lead 10:15.
=lorette 7:19.
=Mavenir 8:25.
=orick 13:16.
=robbins 44:11.
=telapse 13:23.
_____/s/_____
    _____ 52:11.
.
.
< A >.
a.m. 51:4.
able 9:3, 9:9,
    12:18, 12:20,
    34:10.
above 16:3.
above-entitled
    52:9.
absent 36:22,
    37:3.
Absolutely 17:24,
    18:6, 48:8.
Accept 7:6.
acceptable 37:14,
    39:2.

accepted 37:15.
access 12:24.
accomplished 42:8.
accordance 39:7.
according 33:17, 40:25, 41:2.
accordingly 31:22.
accounting 22:22, 45:13.
accounts 38:16.
achieved 13:9, 13:11, 32:4, 42:16, 46:12.
acknowledged 35:10, 36:24.
acquire 24:5.
acquired 44:16.
across 35:19.
Act 11:11, 12:15, 35:25, 49:17.
action 6:11.
actionable 27:24.
actual 24:1, 25:5, 29:9.
Actually 6:9, 15:23, 24:7, 24:19, 27:8, 27:9, 27:12, 46:8, 51:11.
add 36:14.
additional 36:19, 37:6, 37:18, 37:19, 38:3, 39:11.
address 29:12, 29:22, 32:14, 33:1, 42:11.
addressed 28:12.
addresses 33:8, 36:20, 37:6, 37:20, 39:9, 39:11, 39:16, 41:5.
Ademi 2:18, 3:20, 3:21, 6:19, 8:19, 9:7, 29:6, 47:23, 49:2.
adequacy 34:22.
adequate 12:4, 20:25, 33:2, 41:12, 41:15.

adequately 20:10.
administrator 35:18, 37:19, 37:24.
adopted 9:24.
advance 13:3.
advancing 12:12.
advantage 46:2.
adversaries 15:8.
adversary 48:1.
advisors 50:24.
affected 6:25, 26:12.
affidavit 32:21, 36:15.
afford 34:11.
agents 25:16.
aggregate 14:2.
aggressive 17:1.
ago 27:12, 32:21, 33:16, 47:2.
agree 31:5.
agreed 12:7, 12:8, 20:14, 20:24, 48:23.
agreement 5:6, 10:7, 10:9, 18:19, 32:4, 33:11, 34:1, 48:21, 50:17, 50:23, 51:19.
agreements 10:24, 34:6.
ahead 5:5, 25:23.
airport 51:6.
airports 51:11.
al 3:6, 3:7, 3:8.
allegation 27:23.
allows 10:16.
alone 20:13.
already 20:1, 29:23, 48:18, 48:19.
American 27:11.
among 32:11, 44:6.
amount 5:16.
amounted 51:23.
amounts 20:19.
analogous 15:15.
analyses 18:13.
Andrew 2:34, 4:3.
angle 12:11.
angles 11:4.

announced 11:7.
answer 19:9, 25:21, 32:24.
answers 17:22.
anticipated 6:16.
apologize 6:8.
apparatus 43:1.
appeal 44:21.
appealing 50:7.
appear 34:3, 42:1.
Appearances 2:1, 3:11.
Appendix 41:24, 50:14.
application 16:23.
applies 31:20.
apply 9:23, 9:25.
appointed 29:4, 29:6, 29:7.
appreciate 11:25, 12:1, 12:2, 19:14.
appropriate 14:7, 35:20.
approval 27:1, 29:4, 32:16, 32:19, 34:9, 51:21.
approve 5:17.
approved 26:21, 35:19, 37:13.
argue 10:17, 12:20, 14:1, 15:24, 44:24, 47:19.
argued 30:18.
arguing 26:16, 36:5, 38:25.
argument 10:13, 11:8, 22:10, 25:17, 29:12, 30:12, 30:16, 31:3.
arise 8:13, 10:13.
arm 9:18.
around 15:19.
arrangement 51:21.
arrangements 24:22.
articulated 31:2, 32:6.
Asif 1:46, 2:45,

52:7, 52:12.
aspect 15:15.
assess 28:2.
Asset 1:21, 2:22,
    3:5.
assist 6:1.
Associates 3:16,
    5:22, 6:17.
assure 8:21, 15:7,
    28:23, 40:7,
    48:22.
Atlas 49:9, 49:10,
    49:12, 49:13.
attorney 5:16, 13:6,
    13:7, 13:8, 13:16,
    13:22, 14:10,
    16:4, 22:4, 33:1,
    41:13, 41:16,
    41:25, 42:15,
    44:4, 45:18,
    45:19, 51:22.
attorneys 19:20,
    21:13, 23:8,
    25:13, 41:25,
    44:2, 44:3, 44:11,
    44:16, 44:22,
    45:22.
authority 50:13.
average 13:21.
avoid 49:21.
awaiting 51:8.
award 42:15.
aware 30:14.
away 5:14, 9:4.
.
.
< B >.
B. 50:14.
back 7:6, 17:10,
    18:7, 18:9, 18:10,
    18:15, 19:11,
    30:12, 33:9,
    34:20, 40:4, 45:1,
    48:14, 48:17,
    49:24, 51:10,
    51:16.
backs 33:22.
bad 17:25.
badly 50:1.
Baltimore 1:42,

1:49, 2:48.
banker 13:18.
bankers 10:20,
    10:21, 18:20.
bar 10:7, 31:5,
    32:5, 34:1.
based 32:15.
basic 23:8, 36:21.
Basically 39:7,
    44:20.
basis 30:15,
    31:10.
bear 14:7, 33:4.
beaten 50:1.
beefs 34:18.
beginning 5:12.
Behalf 1:5, 1:16,
    1:27, 4:4, 4:7,
    5:4, 5:24,
    36:23.
believe 29:13,
    41:20, 41:23,
    42:12, 42:13,
    47:5.
beneficial 36:20,
    38:11.
benefit 10:16,
    12:21, 15:16,
    16:4, 16:13,
    16:14, 24:2, 24:3,
    31:10.
best 13:4, 20:8,
    21:4, 30:19,
    31:12, 31:21,
    32:15, 48:2.
better 22:17, 27:14,
    28:5, 28:8.
Beyond 25:3.
bigger 35:23.
Bill 4:6, 15:11.
billing 15:1,
    22:3.
billion 15:25, 16:7,
    16:8.
bit 25:25, 49:4.
blenda 14:20.
blew 9:3.
board 10:22, 11:2,
    11:3, 11:5, 11:7,
    20:14, 20:24.

body 33:21.
book 24:9.
booklet 5:25.
Boothe 1:26, 2:26,
    3:8, 3:19, 4:5,
    20:7.
bought 24:8.
breach 7:7, 21:14,
    21:16, 21:19,
    21:21, 45:25.
breakdown 6:11.
brief 13:14, 44:22,
    50:14.
briefing 14:12.
briefly 11:18,
    28:20.
bright 20:23.
broad 31:14.
broker 38:14.
brokerage 23:16,
    24:12.
brokers 23:21,
    26:22, 35:3, 35:6,
    38:3, 38:15.
brought 41:13.
Brower 3:13.
bunch 16:25.
business 44:19,
    45:13.
buyer 13:18,
    47:10.
buyout 10:15.
.
.
< C >.
calendar 18:5.
caliber 15:10.
California 13:15,
    44:11, 47:21.
call 3:3, 9:11.
called 36:4.
calls 38:22.
candid 17:22.
candidly 18:10.
capable 46:16.
Capital 2:10, 3:7,
    3:17, 7:10, 8:17,
    9:21, 9:24,
    27:11.
captured 26:7.

Carter 2:4, 3:6.
cases 6:21, 9:10,
    13:8, 13:9, 13:11,
    13:22, 13:25,
    14:10, 15:5,
    15:15, 15:18,
    27:13, 27:14,
    28:25, 31:9, 32:4,
    35:18, 39:19,
    47:12, 48:24,
    48:25, 49:5, 49:6,
    49:8, 50:7, 50:8,
    50:15, 50:18,
    51:13.
cash 7:8, 7:20,
    18:8, 18:13,
    22:22.
cast 7:1, 8:1,
    32:2.
casting 26:9.
category 5:9.
Syntroleum 9:6.
certainly 9:23.
certify 52:7.
chance 24:24.
Chancery 9:1, 9:17,
    16:2.
change 25:16, 33:11,
    47:3, 47:13.
changed 11:5,
    25:14.
charge 51:5.
charged 22:4.
charity 45:5.
chart 20:12,
    50:20.
check 41:22.
Christine 1:46,
    2:45, 52:7,
    52:12.
chronology 30:3.
Cindy 1:15, 2:16,
    3:21.
Circuit 44:21, 45:3,
    47:3.
circumstances 5:10,
    31:19.
cite 43:19.
cited 13:13, 14:9,
    14:11, 27:2.

City 39:17, 39:22,
    44:12.
CIVIL 1:9, 1:20,
    1:31, 3:6, 3:8,
    50:14.
claim 7:7, 7:8,
    7:22, 12:9, 12:15,
    13:3, 19:3, 21:22,
    22:15, 27:19,
    28:8, 31:12,
    35:25, 40:9, 44:4,
    49:17.
claiming 44:16.
claims 7:6, 7:23,
    8:13, 10:11, 11:1,
    11:10, 12:17,
    13:1, 13:4, 22:16,
    23:2, 27:5, 27:15,
    27:17, 27:18,
    29:15, 30:6,
    30:23, 30:24,
    31:1, 31:2, 31:14,
    36:23, 42:17.
clarify 36:8.
class 6:25, 8:1,
    8:16, 22:7, 29:5,
    29:6, 29:7, 29:10,
    31:21, 31:25,
    32:23, 33:5,
    33:13, 34:4, 34:8,
    34:12, 36:21,
    36:22, 37:3,
    40:23, 42:16.
class-wide 31:10.
classes 31:6.
clear 10:22, 32:2,
    34:1, 49:19.
clearing 24:12.
clearly 30:8,
    30:22.
client 5:2, 45:22,
    49:24.
clients 18:14, 23:5,
    46:19, 49:22,
    51:5.
climbed 46:15.
clock 51:12.
close 12:17, 48:8.
closes 9:20.
CO 10:4, 47:10.

coffers 20:21.
colleagues 41:23,
    46:21, 48:20.
collusive 19:10.
Colony 2:10, 3:7,
    3:17, 3:23, 4:1,
    7:10, 8:17, 9:21,
    9:24, 11:2, 20:15,
    29:1, 29:6.
COLONY CAPITAL, Inc.
    1:10.
colorable 21:22.
combination 16:13,
    49:10.
combine 20:24.
combined 20:17,
    20:21.
comes 9:13.
commenced 30:3.
Commission 26:2,
    26:6.
committed 17:17.
common 36:20,
    46:3.
companies 11:24,
    12:2, 16:6, 19:24,
    20:1, 20:5,
    27:21.
company 10:5, 10:20,
    20:4, 20:11,
    20:21, 20:24,
    21:1, 21:20,
    22:18, 44:15,
    44:19.
compensable 32:7.
compensate 20:10.
compensation 20:20,
    21:20, 22:16,
    44:17, 46:2.
competent 22:2.
complaining 35:2.
complaint 20:7,
    21:6, 21:18,
    27:20, 27:23,
    27:24, 35:3,
    46:1.
complaints 20:2,
    20:6, 22:6,
    22:13.
completely 17:18.

complex 22:22, 45:9, 45:13.
complicated 17:13.
concept 45:21.
concepts 45:21.
concern 5:14, 6:14.
concerned 6:24.
concerning 21:3.
concerns 5:7.
concluded. 52:5.
conclusion 51:25.
condense 41:9.
conduct 9:8.
conducted 8:15, 10:12, 10:20, 29:11, 48:20, 51:9.
conflict 5:13, 6:22, 7:2, 7:24, 8:13, 8:14, 10:17, 10:23, 12:20, 13:18, 19:20, 23:7, 28:3, 29:9.
conflicted 19:25.
conflicts 29:13.
confusion 26:20.
consented 44:6.
consider 16:12, 32:9, 42:11.
consideration 20:9.
considered 38:22.
constitution 11:5.
constructive 40:12.
consulting 10:24.
consummated 20:16, 20:19.
contained 21:10.
contends 35:10.
contested 49:15.
continue 19:19.
contractual 50:16.
contrary 34:18.
controlled 10:3.
coordinate 6:20.
coordinated 5:23, 28:4, 49:9.

coordination 5:10, 5:13, 7:25.
core 16:25.
Corp. 1:32, 2:32, 3:8.
Corporation 9:22, 20:7.
corporations 9:23, 17:4.
Correct 4:14, 4:17, 4:18, 6:9, 18:21, 41:21, 42:23, 52:8.
corrective 44:9.
correctly 4:13, 8:7, 30:2.
Corwin 9:14.
Counsel 3:13, 3:16, 4:1, 5:2, 5:10, 16:16, 17:14, 29:5, 29:6, 29:7, 30:18, 32:3, 32:6, 51:17, 51:20, 51:24, 52:1.
counsels 28:24.
counter-intuitive 31:3.
country 27:1, 35:19.
couple 8:25, 27:12, 29:23, 29:24, 32:21, 33:16.
course 28:5, 44:14.
courtesy 38:2.
courtroom 27:6.
courts 15:8, 15:18, 16:1, 26:21, 35:19.
cover 40:17.
created 32:15.
cross 41:22.
current 18:16, 20:16.
.
.
< D >.
damage-wise 31:4.
damages 9:5, 9:10, 9:20, 10:2, 11:15,

28:9, 30:5, 30:7, 30:8, 32:6, 35:24, 36:4.
date 20:13, 25:14, 32:21, 33:11, 34:1.
day 9:15, 21:5, 38:7, 46:19, 48:13.
days 18:3, 18:4, 18:7, 18:9, 18:10, 18:16, 26:3, 32:20, 51:24.
deadline 33:16, 33:17, 34:14.
deal 7:8, 17:3, 46:13, 47:9, 47:13, 48:9, 48:18.
deals 7:12.
decades 14:22.
December 13:15, 25:1.
decide 45:3.
decided 17:1, 17:10.
decision 24:5.
defeat 12:16, 27:7.
defect 33:6.
Defendant 1:12, 1:23, 1:34, 2:10, 2:22, 2:32, 17:4, 17:9, 32:3, 44:3.
defendants 3:24, 4:4, 4:7, 5:19, 9:19, 18:12, 18:16, 24:23, 31:7, 31:8, 31:10, 31:15, 31:17, 37:24, 38:8, 46:12, 47:8, 49:18, 50:17.
defense 15:10, 15:11, 16:16, 32:3.
defer 19:17.
degree 45:17.
Delaware 7:12, 9:1,

9:17, 9:22, 9:25,
16:2, 21:15,
45:25.
delay 24:23.
delivered 24:19,
38:25.
demand 21:7.
demonstrate 27:25.
deponent 51:9.
deposition 10:12,
51:1, 51:9,
51:14.
depositions 8:16,
8:17, 8:18, 8:19,
10:20, 18:20,
50:25.
deserve 49:3.
Despite 20:13,
20:23.
determined 44:9.
developed 9:16.
devoted 29:14.
different 5:12, 7:5,
10:19, 14:17,
37:1, 40:9, 46:8,
51:11.
differently 26:16.
difficult 46:15,
49:15.
diligence 18:23,
18:24, 18:25.
direct 19:25.
directly 19:9,
19:25.
directors 10:21,
18:21, 19:4.
disclose 8:9, 9:18,
26:12.
disclosed 10:1,
10:24, 10:25,
21:12, 22:24,
40:2.
disclosure 6:23,
9:1, 11:13, 12:4,
13:12, 13:17,
13:20, 19:22,
21:8, 21:9, 22:20,
42:25, 45:23.
disclosures 8:3,
9:8, 11:17, 13:21,

16:19, 16:24,
17:1, 17:2, 17:6,
17:12, 18:12,
19:12, 26:1, 30:4,
44:7, 48:18.
disconnect 25:25,
26:15.
discount 18:13.
discovery 9:8,
12:14, 12:24,
18:19, 48:20.
discussing 26:22.
dismiss 12:16, 27:7,
45:2.
dismissed 45:4.
dispersions 32:2.
dispositive 42:6.
dispute 46:11.
disseminated 26:4.
distinction 7:23,
8:12.
distinctly 5:11.
distribution
24:12.
District 1:1, 1:2,
13:15, 43:21,
47:20.
document 36:16.
documents 12:22.
doing 12:23, 24:2,
24:3, 44:14,
49:10, 50:6.
dollar 46:21, 47:17,
47:18.
dollars 13:17,
51:23.
done 6:21, 8:24,
11:14, 23:13,
24:9, 24:21,
26:15, 26:23,
26:24, 26:25,
27:4, 35:18,
39:18, 42:5,
46:13, 46:17,
48:18, 50:5.
Douglas 13:14,
47:19.
down 35:14, 37:10,
41:9, 43:7, 44:4,
44:10.

downstream 35:15,
35:16.
draft 27:20,
27:24.
drafting 21:6.
draw 34:16.
drawn 34:22.
Due 36:21, 37:3,
37:14, 39:12,
40:20, 40:21,
40:22, 41:8.
duplication 22:5,
22:9.
duplicative 42:1.
during 37:18.
duties 9:11,
21:17.
duty 7:7, 7:12,
7:15, 7:19, 7:23,
9:11, 9:21, 21:15,
21:19, 21:22,
45:22, 45:25.
Dvores 2:38, 4:11,
4:14, 4:15, 19:14,
19:17, 23:9,
25:22, 26:23,
29:12, 36:11,
43:8, 46:6.
.
.
< E >.
e-mail 38:17.
E. 2:6.
earlier 11:1, 25:8,
28:6, 41:19.
early 33:17.
earnings 11:21,
20:22.
easier 49:16.
easily 10:10.
eaten 50:2.
EBT 22:22.
echo 40:14.
effected 26:10.
effective 23:15.
efficiency 51:15.
efficient 6:15,
26:6, 51:15.
effort 22:6,
46:20.

egregious 12:19.
either 7:19, 8:22.
emergency 16:24.
emphasize 29:12.
emphasizes 16:12.
employment 47:9.
end 21:5, 23:4,
   46:7, 46:19.
ended 27:11,
   51:11.
Energy 34:12, 49:9,
   49:13.
enormously 46:15.
enough 19:23.
ensure 10:12, 11:12,
   11:15, 13:1.
enter 12:8, 25:9,
   51:19, 51:21.
entered 18:18, 25:8,
   25:10, 42:1.
entering 9:1.
entire 10:3, 10:13,
   10:17, 12:21,
   29:25, 50:10,
   50:11.
entities 5:11,
   15:22, 20:25,
   39:13.
entitled 8:1,
   47:16.
entity 16:3, 20:17,
   28:2, 39:18.
entries 42:1.
equals 20:14.
equity 15:25,
   16:5.
erroneous 27:18.
error 49:3.
escaping 14:12,
   14:13.
Esquire 2:6, 2:8,
   2:12, 2:14, 2:18,
   2:20, 2:24, 2:28,
   2:30, 2:34.
essence 30:11,
   31:11.
essentially 8:2,
   9:15, 9:17, 11:20,
   30:18.
et 3:6, 3:7, 3:8.

evaluate 21:4.
eve 8:8.
Everything 24:8,
   26:15.
evidence 8:21.
evidently 16:20,
   34:24, 36:12.
exactly 34:13,
   48:25.
example 9:10, 10:23,
   13:13, 15:17,
   38:16, 38:17.
exception 10:2,
   10:16.
excessive 11:2,
   11:8, 42:2, 42:4,
   44:13, 46:1.
Exchange 11:11,
   12:15, 26:2, 26:6,
   35:25, 49:16.
exchanging 7:11.
excuse 19:22.
executive 20:20.
executives 20:19,
   21:20.
exist 31:3, 42:5.
existed 10:17.
expand 17:2.
expect 34:13, 51:21,
   51:24.
expectations
   47:14.
expenses 50:20.
expensive 45:16.
experience 8:24,
   15:20, 22:3,
   26:11, 34:17,
   41:5, 47:12.
explain 37:11.
explains 30:6.
extensive 18:19,
   43:1.
extent 22:10,
   33:18.
extinguished 9:16,
   21:23.
.
.
< F >.
face 34:17.

fact 12:19, 19:23,
   21:18, 22:8,
   23:18, 24:11,
   24:19, 34:16,
   34:23, 35:21,
   37:6, 37:7, 38:19,
   43:15, 45:6, 45:7,
   45:10.
factors 42:10,
   42:12, 42:14.
facts 12:18, 27:19,
   45:24.
failing 44:19.
fails 20:10.
fair 19:7, 27:6,
   33:2, 41:12,
   41:15, 50:11.
fairness 3:10, 10:3,
   10:14, 10:17,
   12:21, 15:9,
   45:21.
faith 33:14.
far 5:14, 23:24.
Farr 3:23.
Faruqi 3:18, 3:19,
   6:18, 8:18, 9:6,
   9:7, 14:20, 15:2,
   28:16.
fault 35:7.
favor 25:17.
FCRR 1:46, 2:45,
   52:7.
Federal 1:47, 2:46,
   11:11, 13:23,
   13:25, 27:1,
   35:19, 43:20,
   45:23, 49:15.
fee 12:10, 13:6,
   13:7, 13:8, 13:16,
   14:1, 14:3, 14:6,
   16:1, 41:13,
   42:15, 44:10,
   46:21, 47:17,
   47:18, 48:12,
   48:13, 48:21,
   49:12, 49:15,
   50:10, 50:11,
   50:15, 50:16,
   50:17.
fees 5:16, 13:22,

14:8, 14:10, 16:4,
21:25, 22:3, 33:1,
41:16, 41:25,
42:2, 43:9, 43:11,
43:13, 44:4,
51:22.
fellow 34:12.
felt 8:2, 11:10.
few 11:6, 18:3,
18:4, 18:7, 18:9,
18:10, 18:16,
25:18, 25:19,
31:9.
FFO 16:25.
fiction 23:25.
fiduciary 7:7, 7:22,
9:21, 21:15,
21:17, 21:19,
21:21, 45:22,
45:25.
fight 17:25, 47:8,
50:6.
fighting 15:8.
fights 48:1.
file 21:15, 26:8,
27:18, 36:2,
45:17.
filed 12:6, 16:23,
21:11, 22:7,
28:25, 29:2,
32:21, 42:6, 44:2,
44:21, 44:22.
filing 23:12, 23:14,
26:5, 26:24,
50:24.
filings 44:15,
44:18, 44:20.
Finance 1:32, 2:32,
3:8, 6:13, 20:7,
46:24.
financial 12:4,
20:5, 20:23, 47:1,
50:24.
find 27:14, 27:16,
28:8, 41:15,
45:13.
finding 44:8.
finds 41:11.
fine 5:1, 37:16,
46:17.

finish 36:11.
fire 32:11.
firm 3:23, 6:16,
8:18, 8:19, 9:6,
18:13, 29:4, 29:7,
29:16.
firms 15:10, 15:11,
23:16, 24:12,
49:11.
first 5:4, 5:19,
17:7, 19:15,
19:16, 19:19,
22:9, 32:8, 32:25,
37:22, 41:3,
41:22.
five 49:11.
flew 51:3.
flight 51:4.
flights 51:11.
Floor 1:48, 2:47.
Florida 51:1,
51:3.
flow 18:13, 22:22.
flows 10:8, 18:8.
focus 15:5.
focused 23:3.
follow 26:17, 26:18,
27:4, 40:14.
foregoing 52:8.
foreseeable 20:23.
forget 11:5.
form 26:5, 40:1.
formality 6:2.
formalization
29:8.
formalized 29:3,
29:8.
former 5:8, 6:17,
45:18.
forth 18:8, 18:15,
48:17.
forward 10:7, 35:12,
38:2, 38:18,
43:16, 51:23.
forwarded 35:6.
fought 18:17.
found 37:13, 44:8,
44:14.
four 41:19, 49:11.
frankly 10:11, 12:3,

14:3, 34:18, 35:7,
50:12.
free 18:8.
frequently 17:14.
Friday 1:41.
friends 48:2, 48:3,
48:4.
front 27:10.
fundamental 30:8.
future 10:7,
20:23.
.
.
< G >.
Garden 39:17,
39:22.
gave 9:2, 9:8,
32:16.
GCG 36:18.
Gendron 2:34, 4:4.
generate 20:22.
gentleman 4:9.
gets 26:10, 39:22.
getting 9:15, 21:20,
24:21, 30:19,
31:10, 37:1,
40:11, 47:22,
49:13, 49:21,
50:9.
give 5:13, 8:13,
10:11, 12:7, 12:9,
24:25, 38:1, 45:1,
48:19, 50:10,
51:2.
given 5:25, 6:22,
17:8, 19:22,
22:17, 23:16,
23:18, 38:19.
gives 7:24.
giving 13:1,
50:10.
global 51:21.
Goldman 18:13,
49:3.
Goldsmith 3:3.
golly 45:14.
governing 10:9.
greatest 5:14.
grossly 42:3.
ground 39:1.

Group 1:21, 2:22, 3:5, 8:15, 8:20, 8:22, 20:3, 22:14, 22:18, 43:24.
growth 20:12.
guess 26:1.
Guri 2:18, 3:20.
.
.
< H >.
Haiber 2:14, 3:25.
half 45:4.
hand 42:24.
handle 37:23.
handled 37:23, 51:14.
handling 47:12.
hands 24:25.
happen 24:10, 24:17.
happened 37:17, 49:9.
happens 26:13, 39:20, 46:3.
hard 18:16, 42:21, 46:23, 47:8.
harm 36:4.
heading 8:6.
hear 5:4, 5:17, 5:18, 13:6, 16:16, 36:13, 39:3, 51:19.
heard 34:20, 51:18, 52:1.
hearing 3:10, 5:9, 6:1, 35:23, 51:18, 51:25.
heart 13:5.
held 5:8, 24:9, 33:7.
help 45:14, 45:15.
Herculean 46:20.
hereby 52:7.
hide 40:13.
high 14:4, 21:6.
higher 13:22.
highest 14:19.
highlighted 28:10.
historical 20:11.
history 27:15.

Hoffman 2:40, 4:22, 4:25, 24:16, 29:24, 30:14, 30:24, 36:23, 41:6, 41:7.
Hogan 3:25.
hold 23:16, 24:5.
holders 36:19, 38:19.
honest 12:3.
Honorable 1:40.
hoping 50:21.
hotel 51:5.
hour 14:18, 15:12.
hourly 14:16, 14:20, 15:7, 15:9.
hours 15:18, 42:4.
Howard 2:40.
hundreds 39:19.
.
.
< I >.
identical 22:13, 48:25.
identifying 13:5, 33:12.
ignored 23:8.
Illinois 13:23.
immediately 26:5, 38:17.
impediments 46:13.
imperative 21:1.
important 7:23, 8:12, 11:24, 17:3, 40:1, 47:1.
importantly 28:7.
in. 26:14.
inadequate 22:16, 44:17.
inadmissible 48:17.
Inc. 2:10.
incentive 27:14, 28:8, 31:17, 46:12, 48:2, 48:5, 48:6, 48:11, 48:22, 49:18, 49:20.
inclined 16:20.
income 11:23.

Incorporated 3:6, 3:7.
incurred 51:16.
independently 23:5.
Indiana 13:24.
indication 15:9.
indicative 33:20.
individual 14:21, 19:23, 19:24, 24:13, 38:16.
Individually 1:4, 1:15, 1:26.
industry 43:2.
inevitable 41:9.
inference 33:20, 34:16, 34:22.
information 8:9, 9:9, 9:19, 10:1, 11:14, 11:24, 12:5, 12:7, 12:9, 12:19, 16:15, 18:1, 21:2, 21:10, 24:24, 26:7, 26:12, 27:25, 30:20, 39:22.
informational 30:13, 30:19, 31:12.
informed 7:1, 8:1, 10:1, 10:22, 11:12, 12:24.
initial 38:6.
initially 30:5, 33:7.
injunction 8:6, 8:8, 12:6, 17:3, 17:5, 17:8, 36:1, 36:2.
inside 51:6.
insisted 18:8.
instance 17:8.
instances 38:10.
Instead 33:13, 49:2.
insurance 44:19.
intelligence 34:12.
intending 24:20.
interest 17:10, 20:8, 21:4, 22:14,

23:7, 31:22.
interested 4:16,
    5:9, 21:13, 21:14,
    43:17.
interesting 22:21.
interests 5:12,
    19:22, 19:25,
    22:11, 46:18.
interim 16:23,
    30:4.
International
    43:24.
internet 38:16.
intersect 10:6.
investigate 29:15.
investigation 8:14,
    30:7.
investment 10:21,
    13:18.
investments 33:7.
invite 34:4.
involve 18:14,
    18:16, 45:8.
involved 8:4, 11:20,
    16:5, 40:11,
    43:20, 44:1.
involves 45:11.
irrelevant 48:17.
irreparable 36:4.
issue 7:5, 11:25,
    12:7, 18:8, 18:15,
    21:14, 22:20,
    22:22, 23:3, 23:7,
    26:1, 29:13,
    39:12, 40:18,
    40:19, 40:20,
    41:13, 41:17,
    43:18.
issued 40:1.
issues 9:2, 10:23,
    18:14, 21:12,
    21:14, 29:23,
    29:24, 41:13.
itself 23:12,
    33:3.
.
.
< J >.
Jack 1:26, 2:26.
James 2:28, 3:18,

28:16.
James K. Bredar
    1:40.
JKB 3:7.
JKB-16-3282 1:9.
JKB-16-3742 1:31,
    3:9.
JKB-16-3745 1:20,
    3:6.
job 46:17, 47:11.
Johnson 42:10,
    42:11, 42:14.
joint 19:22.
Jr 2:24, 2:28.
Juan 2:6, 3:15,
    5:21.
Judge 6:7, 6:8, 8:5,
    13:16, 18:18,
    19:18, 27:10,
    32:15, 32:18,
    32:19, 33:10,
    35:5, 36:5,
    39:7.
judges 15:6.
July 6:3.
jurisdiction 30:10,
    30:17, 49:15.
jurisdictions
    30:9.
.
.
< K >.
keep 7:21, 35:23.
kept 33:13.
Kessler 1:15, 2:16,
    3:5, 3:21.
kind 26:14, 30:21,
    34:6.
KKR 9:14.
known 49:22.
knows 36:3.
Krulak 2:24.
Krulok 4:6.
.
.
< L >.
language 34:6.
large 16:10,
    16:13.
larger 16:1.

last 8:25, 13:15,
    25:9, 47:21,
    48:15.
late 34:8, 34:9,
    38:21.
later 29:2.
Lawrence 2:38,
    4:11.
lawsuit 16:23, 21:7,
    42:9.
lawyer 12:23.
lawyers 12:10,
    27:23, 40:10,
    50:5.
lead 8:16.
least 5:12, 21:22,
    32:22.
left 4:25.
legal 22:4, 23:24,
    23:25, 35:2, 39:1,
    43:1.
Legally 27:18,
    37:14, 38:2.
length 9:18.
less 5:7, 15:7,
    32:20, 34:24,
    49:14, 51:23.
leverage 12:13.
liability 27:9.
light 20:10.
limited 21:10,
    22:20, 30:9,
    43:11.
line 13:8, 14:12,
    14:15, 15:3.
lines 21:19.
lip 8:23.
list 37:25.
listening 30:12,
    30:15.
Litigation 6:21,
    10:7, 12:13,
    27:11, 29:3,
    29:11, 30:3, 40:2,
    40:7, 43:24.
little 25:25, 37:1,
    49:4.
live 26:14.
living 50:6.
local 3:13, 4:1,

14:7, 41:24.
locality 15:6.
lodestar 14:4,
    15:14.
Lombard 1:48,
    2:47.
long 42:5.
look 15:6, 17:10,
    19:5, 22:6, 26:9,
    41:23, 42:8,
    42:13, 42:14,
    44:5, 45:9, 45:10,
    50:1, 51:23.
looking 21:16,
    22:10, 46:14.
looks 41:23, 50:4.
lost 50:9.
lot 18:7, 18:15,
    22:5, 25:18, 28:8,
    33:18, 43:15,
    48:25, 49:23.
Lovells 4:1.
lower 47:14.
loyalties 28:24,
    29:10.
.
.
< M >.
M. 2:24, 2:28.
mailed 26:4, 26:21,
    35:22, 37:20,
    39:13, 43:23,
    44:1.
mailing 23:17,
    26:19.
mainly 16:2.
majority 31:20.
Management 1:21,
    2:22, 3:5, 6:13,
    46:3.
mandatory 12:15.
Manhattan 43:21.
manner 35:7.
marginal 44:8.
mark 21:6.
market 12:1, 12:2,
    15:4, 26:7,
    47:15.
markets 12:3, 26:7,
    26:14, 47:1,

47:7.
Marriott 51:6.
Maryland 1:2, 1:42,
    1:49, 2:48, 7:18,
    9:22, 9:24,
    27:10.
material 8:9, 9:19,
    11:14, 12:4, 21:2,
    24:19.
matrix 14:13,
    41:21.
matter 3:17, 52:9.
matters 3:4, 3:9,
    23:2.
maximize 7:15, 7:19,
    9:11.
mean 9:14, 19:5,
    25:1, 27:8, 28:4,
    36:5, 38:25.
means 19:11,
    43:17.
measures 22:23.
mechanics 37:17,
    39:6.
meeting 19:12.
member 7:25.
members 6:25, 7:9,
    11:3, 22:7, 29:10,
    32:23, 33:5,
    33:13, 34:4,
    34:12, 36:22,
    37:4, 40:23.
merger 5:12, 15:22,
    16:6, 20:9, 20:14,
    21:21, 24:23,
    25:3, 25:5, 25:12,
    43:24.
meritorious 31:12.
merits 30:20.
messaging 34:7.
metaphysical 43:6.
Miles 4:7.
million 13:16, 14:2,
    16:3, 27:12,
    46:21, 47:18,
    47:21, 47:22,
    48:16, 49:12,
    51:23.
mind 7:21, 9:13.
minds 19:12.

mine 14:25.
minor 40:19.
minute 34:14,
    48:15.
minutes 51:18.
misreading 14:24.
misunderstanding
    35:25.
modern 45:20.
modicum 34:11.
modify 33:11.
moment 31:25.
monetary 6:23.
money 9:3, 12:11,
    15:17, 20:20,
    45:4, 45:8, 49:4,
    49:23, 50:22,
    51:5.
MONTEVERDE 2:6,
    3:16, 5:22, 6:17,
    18:11, 18:21,
    22:21, 25:20,
    28:13, 29:1, 29:5,
    30:6, 34:21, 36:7,
    37:11, 46:7,
    48:4.
months 11:6, 25:4,
    47:13.
moot 45:2.
mooted 11:4, 11:9.
mootness 12:10.
morning 3:2, 3:12,
    3:15, 3:22, 4:3,
    4:6, 4:11, 4:19,
    4:21, 4:23, 16:17,
    16:18, 29:20,
    29:21, 30:18,
    46:18.
motion 12:16, 27:7,
    36:5.
motions 42:6.
Motz 6:7, 6:8, 8:5,
    32:16, 32:18,
    32:19, 33:10,
    35:5, 36:5.
MOU 9:2.
mountain 46:15.
Moving 41:11.
MR. ADEMI 3:20.
MR. DVORES 4:12,

4:18, 19:18, 21:9,
22:2, 22:12,
23:10, 23:12,
23:22, 24:7,
25:19, 43:10,
43:14.
MR. GENDRON 4:3.
MR. HAIBER 3:25.
MR. KRULOK 4:6.
MR. MUNDIYA 3:22,
16:17, 16:22,
17:16, 17:20,
17:24, 18:3, 18:6,
18:24, 19:2,
39:5.
MR. ROBINSON 4:21,
19:17, 29:20,
29:22, 30:2,
32:12, 32:14,
32:18, 33:24,
40:18, 41:2,
41:18, 42:23,
43:3.
MR. WILSON 3:18,
28:14, 28:20.
MS. TREPETIN 3:12.
multimillion
47:16.
multiple 47:17.
Mundiya 2:12, 3:23,
39:4, 39:5, 40:14,
47:25, 48:3,
48:12, 51:7,
51:10.
myself 40:10, 44:1,
44:5, 45:1.

.

.

< N >.
nail 35:13, 37:10.
nailed 39:6.
name 4:13, 14:12,
14:13, 23:17,
24:9.
names 36:19, 39:9,
39:11, 39:16.
national 15:4,
15:7.
naturally 10:8.
nature 10:25.

necessarily 43:11.
need 15:5, 17:22,
26:1, 27:21,
31:13, 36:2,
45:14, 51:17,
51:19.
needed 8:1.
nefarious 35:17.
negligence 47:5.
negotiated 32:8.
negotiating 48:13,
48:15.
negotiation 47:25,
48:5, 49:24.
negotiations 18:7,
18:17, 19:10.
net 11:23.
New 3:23, 15:3,
15:11, 22:17,
43:22, 44:12.
night 51:4.
nine 51:18.
No. 1:9, 1:20, 1:31,
48:10, 49:8.
nominee 36:19.
nominees 39:8,
39:15.
nonattorneys 42:3.
nonetheless 34:20.
nonoptout 31:5.
normally 10:4, 15:6,
19:6.
north 15:11.
Northern 1:2, 13:15,
47:20.
Northstar 1:21,
1:32, 2:22, 2:32,
3:5, 3:8, 6:13,
11:2, 20:7.
noted 28:11.
nothing 10:12, 31:4,
35:16, 45:3, 45:6,
50:4.
notices 6:10, 16:14,
24:22, 26:23,
32:23, 33:13,
33:14, 33:25,
35:6, 35:11,
35:12, 35:21,
37:7, 37:18, 38:1,

38:3, 38:6, 38:17,
38:24, 39:7,
39:11, 39:23,
43:23, 43:25.
notification
34:24.
notified 25:15.
notion 27:17.
nowadays 38:15.
NRF 3:19, 6:12,
7:11, 8:18, 9:22,
9:23, 20:8, 20:10,
20:12, 20:13,
20:16, 20:19,
20:21, 20:23,
21:2, 29:2, 29:3,
29:5, 29:16,
36:20, 45:11.
NSAM 4:7, 7:10,
8:20, 9:22, 9:23,
20:15, 29:7,
45:10.
number 3:6, 3:7,
3:9, 6:21, 32:1,
42:4, 48:12,
48:23.
.

.

< O >.
O'reilly 3:21, 6:19,
9:7, 29:6.
object 30:15, 34:2,
38:23, 45:7.
objected 34:5,
36:23.
objecting 38:23.
objection 29:25,
30:25, 33:16,
34:14, 44:2,
45:17.
objections 6:12,
35:21, 38:21.
objector 4:17, 4:22,
43:25.
objectors 5:20, 7:4,
11:25, 12:11,
13:2, 31:22, 32:1,
33:19, 34:23,
35:8, 38:20,
43:16, 46:9.

obligation 28:7.
obtained 9:7, 11:17,
  13:16, 13:25.
obtaining 13:17,
  20:25.
obviously 16:22,
  46:16.
occur 37:21, 38:8.
October 33:17.
October 27th 1:41.
offers 47:4.
office 51:7.
officer 17:23.
officers 28:6.
Official 1:47, 2:46,
  52:13.
Ohio 13:22.
Okay 4:15, 5:4,
  16:9, 23:1, 24:11,
  35:13, 39:8, 43:7,
  45:4, 52:3.
Oklahoma 9:7.
old 9:6, 45:21.
once 18:18, 33:9,
  39:21, 39:22.
One 9:13, 11:1,
  11:4, 12:25, 13:5,
  15:14, 18:11,
  20:3, 23:3, 27:15,
  28:4, 30:21, 36:1,
  39:25, 40:19,
  43:19, 43:25,
  44:11, 44:12,
  47:22, 47:23.
one. 19:21, 22:24,
  46:12.
onerous 11:8.
ongoing 40:7.
operating 26:6.
opponent 15:10.
opponents 16:19.
opportunity 9:8,
  25:21.
opposite 15:24,
  49:20.
opt 40:23.
order 6:4, 6:6, 6:7,
  16:20, 27:24,
  29:4, 32:19,
  33:17, 35:5, 39:8,
  51:20.
ordered 40:24.
orders 34:7.
Ordinarily 5:2.
original 25:10.
originally 11:3,
  28:25.
originated 35:14.
Others 1:5, 1:16,
  1:27, 18:1,
  31:18.
otherwise 12:25,
  20:20, 25:15.
ourselves 29:11.
outcome 41:9, 42:15,
  42:16.
outrage 32:11.
outset 5:6.
outside 38:7.
overcome 19:23.
overpay 48:5.
own 9:3, 9:4, 14:7,
  20:16, 33:25,
  46:1.
owner 38:11.
owners 36:20,
  46:2.
.
.
< P >.
page 11:19, 27:3,
  50:13.
paid 15:17, 27:13,
  47:21, 48:25,
  49:12, 49:13,
  49:16, 50:9,
  50:12.
paint 27:20.
papers 51:25.
paragraph 36:16.
paralegal 14:23.
paralegals 15:1,
  15:3.
part 21:16, 46:20.
particular 22:14,
  22:18, 37:4.
parties 15:22,
  19:21, 20:2, 22:7,
  43:17, 43:18.
partly 32:25.
partner 6:17.
partners 15:12.
party 4:16.
passive 31:18.
past 26:21, 26:25,
  48:1.
pattern 12:19.
pay 48:15, 49:18,
  49:20, 49:21,
  49:23, 50:17,
  50:19, 51:7.
pending 3:4.
Pennsylvania
  49:14.
people 16:14, 24:19,
  25:5, 25:7, 34:18,
  37:2, 37:7, 38:18,
  39:9, 40:12, 41:6,
  45:7, 45:8,
  49:23.
per 30:15, 35:5.
percent 20:17.
perfect 34:24,
  35:1.
performance 20:11.
perhaps 11:3,
  37:8.
period 30:4, 37:18,
  38:7, 39:8,
  41:10.
permitted 34:3.
person 41:4,
  46:24.
personal 8:24,
  26:11.
personally 6:17,
  43:19.
persuade 18:1,
  46:21.
persuaded 16:19,
  44:6.
persuading 8:11.
petition 14:7,
  21:7.
Philip 2:39.
phone 38:22,
  49:25.
phony 44:18.
picture 27:20,
  46:14.

Pipeline 49:10, 49:13.
Piven 3:13.
place 46:3, 46:8.
Plaintiff 1:7, 1:18, 1:29, 2:4, 2:16, 2:26, 3:21, 5:14, 12:22, 22:7, 30:17, 32:6, 46:10, 49:16.
Plaintiffs 3:11, 3:14, 3:19, 3:20, 5:5, 5:10, 5:17, 5:24, 21:13, 25:13, 28:24, 44:16, 44:22.
please 3:2, 8:9, 37:11.
PSLRA 12:16.
pocket 50:23, 51:16.
podium 28:18.
Point 11:1, 13:24, 23:1, 30:23, 31:16, 31:24, 32:5, 34:13, 35:9, 35:23, 36:12, 37:9, 39:25, 41:19, 43:15, 47:2, 50:13, 50:21.
Point. 5:24, 11:19, 13:14, 27:3, 34:20.
pointed 28:6.
points 25:22, 28:10.
position 12:22, 17:14, 20:5.
post 12:17.
potential 10:13, 12:20, 19:3, 20:24, 31:1, 31:2.
potentially 30:5.
Power 5:24, 11:19, 13:14, 27:3, 50:21.
practical 23:23.
practice 40:10.

practicing 14:21.
prairie 32:11.
precedent 15:15.
preliminary 6:3, 8:5, 8:6, 29:4, 32:16, 32:18.
premium 20:25.
prepared 5:24, 6:6, 32:19, 51:19.
present 2:38, 7:1, 24:8, 31:6, 43:4.
presentation 5:18.
presented 6:16, 36:15.
preserve 37:3, 47:9, 50:4.
pretty 9:24, 16:3, 17:1, 34:1.
previously 16:20.
price 7:6, 7:8, 7:22, 19:3, 26:10, 26:12, 27:6.
prices 7:5.
principals 17:17.
principle 31:20, 33:23.
principles 41:8.
private 10:5.
Problem 5:3, 11:21, 32:10, 42:21.
problems 33:3, 33:12.
procedure 10:14, 39:2.
proceed 51:24.
proceeded 8:22.
Proceedings 1:39, 52:5, 52:9.
process 5:13, 10:19, 34:24, 34:25, 35:1, 36:21, 36:25, 37:3, 37:14, 39:12, 40:14, 40:21, 40:22, 41:8.
professional 38:2.
proffers 40:25, 41:2.
profitability

11:22.
profits 11:22.
Projection 13:21, 15:18.
Projections 8:3, 8:10, 13:13, 13:17, 14:1, 15:17, 16:24, 27:22, 28:1, 47:7, 47:11, 47:13, 47:15, 47:19.
pronounce 4:13.
properly 21:3.
proposed 20:8, 20:15, 20:18, 21:3, 24:15, 51:20.
prospects 20:12, 20:13, 20:23.
provide 6:11, 17:23.
provided 33:4, 51:22.
provider 36:18.
proxy 6:24, 17:11, 25:10, 25:16.
purported 20:14.
purpose 6:2, 11:12, 11:13, 12:5.
pursuant 6:3, 26:2, 26:21.
pursue 9:4, 9:9, 11:16, 23:1, 27:16, 28:5, 31:4.
pursued 11:11, 22:15, 22:19, 23:2, 30:23, 40:10, 46:4, 46:10.
pursuing 27:9.
pursuit 17:21, 45:21.
pushed 11:4, 18:9, 19:11.
pushing 18:10.
put 17:11, 34:6.
putting 49:23.
.
.

< Q >.
quantify 42:19.
question 19:9,
  25:13, 25:21,
  30:8, 32:24,
  32:25, 34:21,
  46:1, 46:4.
questions 17:22,
  19:6, 43:4.
quick 47:2.
quickly 24:17,
  46:11.
quite 5:8, 30:22.
quote 20:6, 43:19.
quotes 20:15.
quoting 20:9.
.
.
< R >.
R-e-v-l-o-n 7:14.
R. 2:14.
raise 7:4, 34:13,
  34:21, 41:14.
raised 18:14.
raising 30:15,
  34:14, 40:20.
ran 29:10.
rate 13:20, 14:19,
  14:20, 14:21,
  15:10.
rates 14:16, 14:23,
  15:4, 15:5, 15:7,
  41:25.
rather 37:16,
  39:14.
ratify 5:6, 9:18.
ratio 22:17.
re 43:24.
reached 47:14,
  48:12, 50:17,
  50:23.
react 45:16.
read 22:12, 45:12.
readily 17:6.
ready 47:24.
realistic 36:6.
Reality 3:8, 6:13,
  20:7, 29:9.
really 7:1, 10:8,
  11:22, 11:25,

12:5, 13:5, 17:25,
  22:2, 23:14,
  23:15, 23:18,
  24:21, 25:25,
  42:4, 42:18,
  42:21, 45:19.
Realty 1:32, 2:32.
reason 12:8, 47:17,
  48:23, 49:1.
reasonable 19:8,
  33:2, 33:20,
  41:12, 41:16,
  41:24, 42:7.
reasonableness
  42:15.
reasonably 34:13.
recall 8:7.
receive 8:2, 20:19,
  21:2.
received 36:19,
  37:19, 38:21,
  38:22, 38:24,
  44:17.
receiving 10:15.
recent 9:16,
  20:11.
recitation 27:19.
recognized 29:13,
  41:20.
record 32:2, 32:15,
  37:25, 38:19,
  47:6, 49:19,
  52:9.
records 29:14.
recover 9:3.
recovering 27:12.
reduced 11:7, 14:3,
  44:3, 44:10.
referred 7:15.
referring 6:12.
reflects 22:9.
Regardless 10:9,
  15:21.
registered 24:10.
regularly 26:13.
regulating 43:1.
related 8:3, 8:10.
relationship 14:6.
relatively 46:11.
release 29:15,

30:24, 30:25,
  31:14, 48:19.
releasing 31:1.
relief 16:24.
rely 15:4, 23:25,
  24:11, 39:15.
relying 23:25.
remained 20:21.
remedy 36:3.
Remembering 42:16.
remove 46:13.
rep 29:5.
repeat 29:25,
  41:18.
reply 50:14.
Reporter 1:47, 2:46,
  52:13.
reporting 37:19.
represent 23:5,
  38:20.
representations
  19:1.
representative
  38:13.
represented 19:21,
  28:25, 29:2.
representing 4:22,
  19:20, 20:3,
  22:15, 46:18.
represents 19:19.
reputable 35:17,
  39:17.
request 21:7,
  38:3.
require 42:25.
required 26:15,
  35:5, 38:1, 38:4,
  40:15.
requires 35:4,
  38:18, 39:12.
research 44:14.
resend 41:7.
resolution 46:11.
respect 5:15, 18:11,
  18:12, 29:15,
  31:17, 37:17.
respective 8:16.
respond 25:21.
responsibilities
  17:19.

rest 49:3.
resubmittal 51:24.
result 13:12, 21:21, 22:16.
retained 50:25.
retired 45:19.
revenues 11:20, 11:21.
reviewed 44:7.
Revlon 7:12, 7:14, 7:15, 9:11.
revolution 32:13.
Rice 44:12.
rid 31:10.
rights 9:15, 37:3.
rise 5:13, 7:24, 9:2.
Risk 17:3, 17:4, 17:8, 17:9, 17:10.
Robinson 2:39, 4:20, 4:23, 4:25, 19:15, 25:23, 29:19, 31:24, 36:11, 36:14, 40:16, 42:10, 43:7.
Rockville 27:10.
room 51:8.
roughly 16:7.
Royal 44:11.
RPR 1:46, 2:45, 52:7.
Rubin 27:10.
rule 14:7.
rules 26:2, 41:24.
rushed 51:10.
Russell 36:10.
ruthless 49:24.
.
.
< S >.
Sachs 18:13.
save 51:5.
saw 14:23.
saying 5:23, 10:8, 13:2, 13:3, 22:21, 23:4, 23:23, 24:18, 32:22, 38:23, 40:12, 41:8.

says 9:17, 21:19, 36:16, 41:24, 45:10.
schedule 14:7, 37:12.
scienter 47:4.
score 18:21.
Scott 2:14, 3:25.
se 30:15.
seated 3:2, 4:10.
SEC 21:11, 23:12, 44:15.
second 26:8, 38:8.
Securities 26:2, 26:5, 37:1, 43:2.
seek 12:10.
seeking 16:24, 22:1, 42:2.
seeming 5:11.
seems 22:5.
send 37:6, 41:7.
sending 32:22, 33:13, 35:11.
sense 7:25, 17:2, 51:2.
sent 21:11, 33:5, 33:25, 35:5, 38:6, 41:3, 52:1.
sentencing 51:18.
separate 17:18, 22:11, 22:14, 51:10.
serious 24:21.
seriousness 50:5.
service 8:23, 22:4.
servicer 35:14.
services 22:4.
set 8:7, 12:18, 47:13, 50:8.
sets 14:1, 44:11, 47:18.
settle 12:13.
settled 8:8, 8:15, 40:9, 50:8.
settlement 8:23, 9:4, 12:8, 13:20, 17:15, 18:19, 19:7, 19:10,

21:23, 24:16, 26:20, 27:1, 31:5, 32:4, 32:8, 33:2, 33:11, 33:20, 34:1, 34:6, 35:22, 36:21, 41:11, 48:12.
settling 27:11, 44:23.
seven. 9:14.
several 6:18, 6:20, 8:24.
shall 32:20.
shaped 45:23, 45:24.
share 20:17, 46:2.
shareholder 7:16, 7:20, 9:11, 9:15, 23:13, 29:1.
shares 7:11, 22:17.
shifting 50:15, 50:16.
short 41:10.
shouldn't 37:2.
show 12:19, 15:16, 47:11, 48:25.
showed 44:15, 44:18.
shown 20:12.
shows 27:15, 35:22, 45:6, 47:6, 50:22.
side 5:14, 11:11, 46:10.
sides 50:6.
sign 32:19.
signal 51:20, 52:1.
significant 11:18, 20:19, 20:22.
silence 34:17.
similar 13:18.
Similarly 1:5, 1:16, 1:27, 7:18.
simply 17:5, 23:23.
single 22:23.
sir 4:11, 23:11, 28:22, 52:3.

sit 43:7.
sits 5:2.
sitting 4:25,
  30:12.
Situated 1:6, 1:17,
  1:28.
situation 44:13.
six 47:13.
size 15:21.
skilled 15:3.
slide 6:10, 9:14,
  48:24, 50:21.
small 17:8.
sold 24:8.
solely 29:2.
somehow 43:17,
  44:2.
someone 10:15,
  20:3.
sometimes 10:16,
  10:17, 33:19,
  47:8.
soon 44:1, 45:16.
Sorry 6:9, 44:5.
sort 29:23, 30:2,
  30:16, 30:21,
  31:3, 32:25.
sorts 31:1.
sought 36:1,
  41:25.
sound 14:4.
sounded 30:4.
Southern 43:21.
space 40:11.
speaking 5:23.
specific 5:7.
speculate 13:4.
spent 50:22,
  50:23.
spot 17:13.
stand 20:13.
standard 37:12,
  47:4.
start 5:22, 25:25,
  40:11, 47:2,
  51:17.
started 7:2, 43:6.
state 7:7, 9:21,
  12:17, 27:2,
  27:19, 30:10,

49:14.
stated 20:1.
statement 6:24,
  17:11, 22:13,
  25:11.
STATES 1:1, 26:16.
status 4:16.
statute 11:12,
  11:15, 47:4.
stay 5:1, 12:16.
stenographic 52:8.
step 7:6, 32:8,
  41:22.
stock 7:9, 7:12,
  20:12, 23:16,
  24:5, 24:10,
  26:10, 36:20,
  38:11, 47:7,
  47:15.
Stockbridge 4:7.
stockbroker 24:11.
stockholders 20:10,
  21:1, 21:2,
  24:25.
stocks 24:8.
Street 1:48, 2:47,
  23:16, 24:9.
strikes 18:2.
strong 20:11,
  20:13.
stronger 20:4.
strongly 5:7, 5:8.
structural 33:6.
stuff 46:3.
submit 13:7,
  39:10.
submitted 5:15,
  29:14, 51:22.
success 50:21.
sue 7:22, 10:2.
sued 7:21, 9:19,
  49:22.
suggest 18:5,
  31:19.
suggests 6:5.
sum 20:21, 40:18.
summarize 29:24,
  40:19.
summarizes 43:4.
supplement 48:14.

supplemental 17:12,
  30:4, 40:22, 41:5,
  42:17.
support 19:7,
  35:22.
supported 26:25,
  36:6.
supports 14:5,
  35:20.
suppose 42:25.
Supreme 37:14.
survive 12:18.
sworn 33:15,
  33:25.
system 41:3.
.
.
.
< T >.
T. 1:46, 2:45,
  52:12.
table 34:4, 43:12.
tales 47:2.
talks 50:14.
tall 46:15.
Tampa 51:1, 51:3.
target 49:23.
Tariq 2:12, 3:22.
taxi 51:7.
ten 51:24.
tend 13:22.
tender 47:4.
tends 11:15.
term 32:8.
terms 23:2, 39:6,
  39:12, 40:9,
  42:13.
tested 19:1, 19:2.
testifying 36:21.
testimony 33:4,
  33:15, 33:25.
THE CLERK 3:4.
therapeutic 9:2.
Thereafter 18:18.
they'll 45:13.
They've 32:4, 32:15,
  33:4, 36:24,
  41:25.
thinking 12:11,
  49:4.
thinks 13:6.

though 23:21,
32:10.
thousand 37:13.
thousands 32:23,
33:15, 33:25,
39:19.
three 6:25, 7:9,
11:23, 14:1,
14:22, 16:6, 24:9,
41:18, 47:18,
49:5, 49:6, 49:8,
50:18.
three-way 20:14.
throw 45:12.
tie 27:22.
timely 33:6, 34:2,
35:6.
timetable 11:6,
37:4.
today 4:16, 4:22,
6:1, 12:12, 13:2,
32:9, 32:21,
40:20, 41:17.
together 27:22,
44:3.
token 31:16.
Ton 33:22.
took 8:16, 8:17,
8:18, 8:19, 24:15,
45:4, 45:22,
51:1.
topic 43:12.
total 5:16, 16:5,
46:14, 51:22.
touch 28:21.
towards 8:6.
Tower 43:24.
traditional 10:14.
transaction 7:9,
7:20, 9:18, 9:20,
10:3, 11:6, 15:25,
16:10, 20:8,
20:15, 20:18,
21:3, 26:25.
transactions 7:10,
10:23.
Transcript 1:39,
52:8.
travel 50:25.
treated 49:7.

Trepetin 2:8, 2:20,
2:30, 3:13.
trial 50:8.
tried 15:24.
true 30:10, 49:20.
trying 32:5, 35:13,
40:13, 47:3.
turn 18:1, 25:22.
turns 43:15.
two 6:12, 9:10,
12:9, 14:22,
19:20, 20:1, 20:5,
20:24, 28:10,
31:22, 34:23,
35:8, 35:21,
43:16, 44:11,
45:6, 45:15,
47:2.
type 13:18, 15:5,
19:6.
types 35:18.
typical 39:6.
typically 15:19,
32:3.
.
.
< U >.
U.S. 43:21.
ultimate 38:11.
ultimately 42:8.
uncertainty 31:11.
uncover 9:9.
uncovered 8:22,
9:2.
underlying 15:21.
understand 7:4,
17:18, 31:7,
33:14, 36:25,
41:3, 45:14,
46:25.
understanding
37:25.
understood 30:2.
undue 21:20.
unheard 15:12.
unique 10:16,
12:20.
UNITED 1:1, 23:4,
23:6.
Unless 12:18, 14:24,

43:3.
unlikely 5:16,
12:17.
unreasonable 13:7.
until 12:16, 34:15,
48:13.
unusual 6:20.
upset 13:5.
uses 16:11.
using 26:8.
.
.
< V >.
v. 3:19, 9:14.
vacation 51:13.
valuable 26:12,
27:21, 30:20.
valuations 19:5.
value 7:16, 7:20,
9:11, 12:2, 13:1,
15:16, 28:2,
31:14, 42:18,
42:19, 42:25,
43:2, 44:9.
various 22:23.
vast 31:20.
Venable 4:4.
versus 3:5, 3:6,
3:8, 13:14,
47:20.
via 38:17.
viability 19:3.
viable 10:11, 27:15,
28:8.
victory 12:10.
view 31:20, 46:9.
visibility 39:14,
39:21.
vote 7:1, 8:1, 10:1,
11:12, 11:14,
12:24, 23:13,
24:2, 24:23, 25:4,
25:5, 25:9, 25:10,
25:11, 25:16,
26:3.
votes 25:14, 26:9.
vs 1:8, 1:19,
1:30.
.
.

< W >.
W. 1:48, 2:47.
wait 25:9, 34:14.
waive 36:23.
walk 11:18, 27:5,
  47:24.
walked 9:4.
wanted 25:16, 28:1,
  28:20, 29:11,
  36:8, 43:4, 43:7,
  44:23, 45:7,
  48:16.
wants 32:3, 36:12.
wastebasket 45:12.
water 21:6.
wayside 30:6.
weaker 20:25.
week 25:9.
weekend 51:3.
weeks 24:14, 24:15,
  27:12, 32:21,
  33:16, 47:2,
  50:2.
well-positioned
  20:22.
whatever 5:18.
whatsoever 7:3,
  11:10, 48:2,
  48:22.
whether 21:4, 30:16,
  30:20, 31:12,
  34:5, 35:14,
  35:15.
Witney 13:14,
  47:20.
will 5:6, 5:17,
  5:23, 5:25, 11:1,
  19:17, 20:16,
  20:19, 25:24,
  26:12, 34:2,
  40:11, 40:14,
  44:25, 45:2, 45:3,
  47:10, 50:17,
  51:20.
William 2:4, 2:24.
WILLIAM CARTER
  1:4.
Willkie 3:23.
Wilson 2:28, 3:18,
  8:18, 28:16,
28:19, 28:23,
  29:18, 47:22.
windfall 50:11.
window 11:8.
windows 51:8.
wish 5:18, 5:19,
  27:5, 27:8.
within 40:24.
Without 20:25,
  30:19, 34:9, 47:7,
  48:12, 48:20,
  51:25.
won 44:24.
wonder 30:16.
work 15:17, 25:2,
  42:5, 47:15.
working 6:18, 6:19,
  51:12.
works 35:1, 37:24.
worth 15:19, 17:5.
worthless 47:8.
wrote 25:15.
.
.
< X >.
X. 34:15.
.
.
< Y >.
Y. 34:15.
year 20:12, 47:21.
years 6:19, 6:20,
  8:25, 45:19.
Yelena 2:8, 2:20,
  2:30, 3:12.
yield 13:22.
yielded 13:23,
  13:24.
York 3:23, 15:3,
  15:11, 43:22,
  44:12.
yourselves 44:6.